## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

DARRELL HAMPTON

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO;
CHIEF OF POLICE PAUL PAZEN, in his individual capacity;
OFFICER JOHN ALLRED, in his individual capacity; and
SERGEANT CARLA HAVARD, in her individual capacity,

     Defendants.

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiff Darrell Hampton, by and through his attorney Andy McNulty, respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

1.     Following the death of George Floyd on May 25, 2020, Darrell Hampton joined protesters in Denver and across the county in voicing their opposition to an epidemic of law enforcement violence against people of color. They said the names of not just George Floyd and Breonna Taylor, but also chanted the names of lives lost to police brutality closer to home, including Elijah McClain, Jessica Hernandez, Marvin Booker, and Michael Marshall.

2.     While speaking out against police brutality, Mr. Hampton, a Black man, became a victim of the same police brutality he was protesting.

3.     Mr. Hampton attended the peaceful Denver protest for Black lives on May 30, 2020 with two friends. Mr. Hampton attended with the intention of exercising his First

Amendment rights but instead was confronted with what would turn out to be a hallmark of the Denver protests: escalation, intimidation, and the excessive use of force by the Denver Police Department ("DPD"). Mr. Hampton was shot in the face with a pepper ball by a DPD officer while simply standing on the sidewalk using his smartphone to record the overly militarized response by DPD officers to a peaceful protest. This excessive use of force violated Mr. Hampton's constitutional rights.

4.      The City and County of Denver's ("Denver") actions, while unconstitutional in any context, are even more pernicious here because the use of excessive force has specifically targeted peaceful demonstrators who assembled to protest police violence and brutality, including in particular police brutality that disproportionately targets Black Americans.

5.      Plaintiff demands that Denver and its police department accept and act in accordance with the principle that Black lives matter equally in our society and stop using indiscriminate or unlawfully targeted force against peaceful protesters exercising their First Amendment rights to assemble, speak, and petition their government for a redress of grievances.

## PARTIES

6.      At all times pertinent to the subject matter of this litigation, Plaintiff Darrell Hampton was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

7.      Defendant Denver is a Colorado municipal corporation.

8.      At all times pertinent to the subject matter of this litigation, Defendant Paul Pazen was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Pazen was acting under color of state law in his capacity as Chief of Police of Denver. Defendant Pazen was responsible for supervising Defendants John Allred and Carla

Havard and directing their actions during the protests in response to the murder of George Floyd
and, specifically, their actions during the protest on May 30, 2020.

9.      At all times pertinent to the subject matter of this litigation, Defendant John
Allred was a citizen of the United States and resident of and domiciled in Colorado. At all times
pertinent, Defendant Allred was acting within the scope of his official duties and employment
and under color of state law in his capacity as a law enforcement officer employed by the DPD.

10.     At all times pertinent to the subject matter of this litigation, Defendant Carla
Havard was a citizen of the United States and resident of and domiciled in Colorado. At all times
pertinent, Defendant Havard was acting within the scope of her official duties and employment
and under color of state law in her capacity as a law enforcement officer employed by the DPD.
Defendant Havard was responsible for supervising Defendant Allred and directing his actions
during the protests in response to the murder of George Floyd and, specifically, his actions
during the protest on May 30, 2020

## JURISDICTION AND VENUE

11.     This action arises under the Constitution and laws of the United States and is
brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28
U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred
by 42 U.S.C. § 1988.

12.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the
events giving rise to the claims occurred in this District and all Defendants reside in this District.

## FACTUAL ALLEGATIONS

**The murders of George Floyd and Breonna Taylor, which were just the latest examples of longstanding police racism and violence, were a tipping point that led to mass protests in May and June of 2020.**

13.     Eight minutes and forty-six seconds. That's how long Minneapolis Police Officer Derek Chauvin suffocated George Floyd by kneeling on his neck. On May 25, 2020, George Floyd's name joined the long list of social media hashtags that have become synonymous with state-sanctioned murders of Black Americans. This list is as extensive as it is devastating, and includes the following Black men and women who have been murdered by police officers.

14.     Breonna Taylor was shot eight times and killed by three plainclothes officers in Louisville, Kentucky, who entered her home in the middle of the night to execute a no-knock warrant.

15.     Elijah McClain was killed by Aurora police officers while walking down a street unarmed and dancing to music.

16.     De'Von Bailey was shot in the back and killed by Colorado Springs police.

17.     Michael Marshall was killed by Denver sheriff deputies after asphyxiating on his own vomit while being restrained for eleven minutes.

18.     Marvin Booker was killed by Denver sheriff deputies who shocked him with a Taser, put him in a sleeper hold and hit him with nunchucks as they pinned him to the floor.

19.     Laquan McDonald was fatally shot in the back by a Chicago police officer.

20.     Freddie Gray was given a "rough ride" by Baltimore police officers and died a week after suffering a severe spinal injury in a Baltimore Police Department van.

21.     Aiyana Stanley-Jones was shot and killed in a raid by the Detroit Police Department.

22.     Botham Jean was fatally shot in his own apartment by an off-duty officer of the

Dallas Police Department.

23.    Yvette Smith was fatally shot by a sheriff's deputy in Bastrop County, Texas.

24.    Alton Sterling was fatally shot by an officer in the Baton Rouge Police Department.

25.    Tamir Rice, a Black child, was killed by a Cleveland police officer.

26.    Philando Castile was fatally shot during a traffic stop by a police officer from St. Anthony, Minnesota.

27.    Stephon Clark was shot and killed in the backyard of his grandmother's house by two officers of the Sacramento Police Department.

28.    Walter Scott was shot in the back and killed by a North Charleston police officer after being stopped for a nonfunctioning brake light.

29.    Michael Brown was fatally shot by a police officer in Ferguson, Missouri.

30.    This list of Black Americans killed by police is not an exhaustive one, as compiling one would be nearly impossible. Similarly difficult to create is a list of the countless law enforcement officers that have gone unpunished for the murders of these countless victims.

31.    Because of the long-simmering outrage for an unchecked and racist system of policing that spans this country, it took only one day after the death of George Floyd for the city of Minneapolis to take to the streets in defense of Black lives.

32.    It took only three days for the people of Denver to join their fellow Americans and begin what would become over a week of near-constant, and nearly five months of intermittent but consistently peaceful protests against police brutality. Coloradans stood in solidarity with the Black community across this nation. Those who spoke out and exercised their First Amendment rights were met with the very brutality they were protesting.

**<u>Mr. Hampton takes to the streets in honor of George Floyd, and the countless other Black Americans who have been murdered by racist police officers.</u>**

5

33.    On May 30, 2020, Mr. Hampton joined the peaceful protests that erupted across the country in solidarity with the fight for Black lives. Mr. Hampton attended the peaceful protest against police brutality with two friends near the Colorado State Capitol.

34.    After participating in the peaceful protest throughout the day, Mr. Hampton was standing on the sidewalk near the intersection of Fourteenth Street and Lincoln Avenue at approximately 5:30 p.m. Mr. Hampton was on west sidewalk of Lincoln Avenue across from the Capitol. He was exercising his First Amendment rights on that sidewalk through his participation in the ongoing protest against police brutality.

35.    While standing on the sidewalk, Mr. Hampton observed a group of heavily armed and armored DPD officers pull up in the street on the back of a DPD vehicle.

36.    Mr. Hampton looked around and saw the stark contrast between the peaceful protesters gathered at the Capitol, and the DPD officers who were geared for war.

37.    Mr. Hampton decided to document the overly militarized response to a peaceful protest in support of Black lives. The protesters, including Mr. Hampton, were there protesting the very militarization of police that the DPD officer's presence and appearance was symbolic of.

38.    Mr. Hampton pulled out his cell phone and began recording the officers from the sidewalk on the west side of Lincoln Street across from the Capitol.

39.    The officers on the back of the vehicle, including Defendants Allred and Havard, observed Mr. Hampton recording their activity with his smartphone. Defendant Allred was carrying a pepper ball gun.

40.    Upon observing Mr. Hampton recording him, Defendant Allred aimed his pepper ball gun directly at Mr. Hampton.

41.     Then, with issuing any warning whatsoever, Defendant Allred aimed his pepper
ball launcher directly at Mr. Hampton's face. He fired a pepper ball directly at Mr. Hampton's
face. The pepper ball struck Mr. Hampton's phone, which he was holding directly in front of his
head and exploded into his face.

42.     After being struck with the pepper ball, Mr. Hampton fell to the ground. His face
burned from the pepper ball and he was disoriented. He was eventually helped up by fellow
demonstrators who moved him away from the officers. Another protestor poured milk on Mr.
Hampton's face to calm the irritation caused by the pepper ball. Below Mr. Hampton can be
seen, on the right side of the photograph, after being doused in milk but still suffering the effects
of the pepper ball.



*Mr. Hampton almost immediately after having been shot by Defendant Allred*

43.     Mr. Hampton's face burned for hours after he was shot. Being shot with the
pepper ball caused him bruising and physical pain and suffering.

44.     The pepper ball broke Mr. Hampton's phone, causing it to crack.

45.     Below is a still taken from the video Mr. Hampton was recording at the time of

the incident. In that still, you can see Defendant Allred pointing directly at Mr. Hampton's face.



*Defendant Allred specifically targeting Mr. Hampton*

46.     The moment before and after Mr. Hampton being shot were captured by a

bystander. It is clear that Mr. Hampton was standing on the public sidewalk and peacefully

exercising his First Amendment rights. In the second photo, you can see the pepper ball strike

Mr. Hampton's phone, which was directly in front of his head, and explode into his face.



*Mr. Hampton, on the right in a hooded sweatshirt and backpack, exercising his First Amendment rights while Defendant Allred directly targets him*



*Mr. Hampton after being hit in the face with Defendant Allred's pepper ball*

47.     Defendants Allred and Havard never issued any order to disperse prior to authorizing the use of, and actually using, the pepper ball gun against Mr. Hampton.

48.     Defendant Havard gave Defendant Allred the authority to utilize his pepper ball gun against the peaceful protesters, including Mr. Hampton.

49.     When he was shot, and throughout the entirety of the time he was protesting on

May 30, 2020, Mr. Hampton was not participating in any activity that could be characterized as

threatening towards the DPD law enforcement officers at any point in the interaction. Mr.

Hampton never committed any crime. Mr. Hampton never engaged in any property damage or

engaged in any activity that could be construed as threatening to destroy any property. Mr.

Hampton never engaged in any violence or engaged in any activity that could be construed as

threatening to violence to anyone.

50.     Shortly after being shot with the pepper ball by DPD, Mr. Hampton and his

friends left the demonstration. A reasonable person in Mr. Hampton's position would have left

the demonstration.

51.     Mr. Hampton was merely filming a police officer, protesting police brutality, and

gathering with those in remembrance of George Floyd with others, from a distance on a

sidewalk. There was absolutely no justification for using any force on Mr. Hampton, let alone

shooting him in the face with a pepper ball.

**Denver's Decision to Clear Defendants Allred and Havard of Any Wrongdoing and
Ratify Their Conduct Demonstrates that Defendants Allred's and Havard's Conduct
Was in Accordance with Denver's Customs, Policies, Practices, And Training**

52.     Consistent with Denver's longstanding pattern in response to officers who use

excessive force against protesters, and particularly its officers use of force against protesters

during the George Floyd protests, Denver did not impose *any* discipline against Defendants

Allred and Havard for their actions. In fact, it found that their actions did not violate DPD policy

thereby sending a message to Defendants Allred and Havard that their actions were entirely

consistent with DPD customs and practices.

53.     Defendant Havard, who was supervising Defendant Allred, testified during the

internal affairs investigation that Defendant Allred's use of force against Mr. Hampton was consistent with Denver policy and training.

54.    Upon information and belief, Denver has provided no additional training to any Defendant, or other Denver officers, related to the incident with Mr. Hampton.

55.    Through Denver's unlawful conduct of condoning the conduct of Defendants Allred and Havard, Denver ratified the unconstitutional practices of Defendants Allred and Havard.

**DPD Officers Used Potentially Deadly Force Against Mr. Hampton**

56.    DPD officers used a number of Kinetic Impact Projectiles ("KIPs") against peaceful protesters, including Mr. Hampton, during the protests. These KIPs included foam bullets, beanbag rounds, pepper balls, and tear gas canisters.

57.    KIPs have a larger surface area than other ammunition, and thus they take unpredictable flight paths and reduced accuracy is inevitable.[1]

58.    It is extremely common for KIPs to cause contusions, abrasions, and hematomas.[2] Additionally, blunt impact may cause internal injuries.[3]

59.    Fatalities may occur when impact is at the head, neck, or precordium (the region of the chest immediately in front of the heart).[4]

---

[1] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; *Kinetic Impact Projectiles*, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.
[2] W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.
[3] *Id.*
[4] *Id.*

60.     According to a systematic review of available literature, three percent of those injured by KIPs died from their injuries.[5] Fifteen percent of 1,984 people studied were permanently injured by them.[6]

61.     DPD officers shot pepper balls at peaceful protesters and bystanders, like Mr. Hampton. Pepper balls have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.[7]

62.     In addition to the burning effect of the OC contained in the pepper balls, the balls themselves can cause serious injury—even death—because of the high velocity at which they are shot. The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second, or more than 238 miles per hour.[8]

63.     The Boston Police Department suspended use of pepper balls in 2004 after a college student was killed when a pepper ball struck her in the eye.[9]

64.     University of California, Davis police shot a pepper ball at an unarmed student while trying to break up a block party and permanently damaged his eye in 2004.[10]

---

[5] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.
[6] *Id.*
[7] Florida Gulf Coast University, Weapons & Equipment Research Institute, *Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis* (2008).
[8] 2019 Product Catalog, PepperBall, https://www.pepperball.com/wp-content/uploads/2019/01/PepperBall-2019-product-catalog.pdf.
[9] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, Wash. Post, Oct. 24, 2004, https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5.
[10] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. Times, July 12, 2012, https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.

65.     Denver itself has been called on, and conducted an internal investigation on, whether to end the use of pepper balls after they were used in response to Occupy demonstrations in October of 2011.

66.     Since the protests began on May 28, 2020, at least 60 protesters nationwide sustained serious injuries from the use of "less-lethal" weapons by law enforcement, including "a broken jaw, traumatic brain injuries, and blindness."[11]

67.     DPD officers' use of KIPs, including pepper balls, against peaceful protesters, was approved, condoned, and ratified by Denver and Chief Pazen. DPD officers were given specific authorization to use these KIPs, including pepper balls, on completely peaceful protesters by Denver and Chief Pazen.

**DPD Officers Have a History of Indiscriminately Shooting Crowds of Peaceful Protesters with KIPs**

68.     On October 29, 2011, Denver police officers responded to a peaceful protest by indiscriminately shooting protesters with KIPs, including pepper balls. Denver police officers fired a number of these rounds at people who were lawfully dispersing. Not only did Denver police officers shoot KIPs, including pepper balls, indiscriminately into the crowd of peaceful protesters, but they also routinely targeted individuals' faces. For example, Denver police officers shot Philip Becerra in the face with a pepper ball. Mr. Becerra suffered facial injuries on the bridge of his nose, less than an inch from his left eye. Mr. Becerra could have easily been blinded in that eye, or even killed, by this indiscriminate use of force

---

[11] Kaiser Health News, *Fractured skulls, lost eyes: Police often break own rules using "rubber bullets"*, Denver Post, June 23, 2020, https://www.denverpost.com/2020/06/23/george-floyd-protests-rubber-bullet-injuries.

69.     After the October 29, 2011 incident, the ACLU of Colorado sent a letter outlining the concerns associated with the use of indiscriminate force by DPD officers to Denver.

70.     Despite being notified of these grossly excessive uses of force and the widespread nature of it, upon information and belief, Denver did not provide further training to their officers or discipline any officer involved. Denver's ratification of this indiscriminate use of force by its officers signaled to DPD officers that such force was consistent with Denver's customs, policies, practices, and training, and that DPD officers can use such force without any risk of discipline.

**DPD Officers Purposefully and Customarily Shot Protesters, and Those Assumed to be Protesters, in the Head, Neck, Face, and Chest with KIPs**

71.     On May 28, 2020, Michael Acker, a young Black college student, was peacefully protesting in a march from the Capitol building to I-25. There, he watched from the pedestrian bridge as other protesters marched onto I-25. DPD officers formed a police line on the west side of Platte Street near the pedestrian bridge. At this point, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask that someone had given him and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a KIP at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. Over a month after the injury, Mr. Acker continued to experience foggy vision, light sensitivity, inability to read, and difficulty tracking movement in his right eye.



*Mr. Acker moments after being shot in the eye.*

72.     On May 28, 2020, while he was covering the protests rally at the State Capitol.

Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by

pepper-ball rounds fired by law enforcement personnel. One round cut Chang's arm. The other

shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event

as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice.

I'm very sure he pointed at me*."*



*Hyoung Chang's arm after being shot.*

73.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP. While at the protest, Mr. Thorn served at times as a medic. Mr. Thorn is a veteran who served in the Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, DPD officers targeted him and shot pepper balls. He observed a largely peaceful protest. He witnessed DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately with these ordinances and without regard for safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was struck that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times.

When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time. ⌞SEP⌟

74.     On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball.

75.     On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol. When she was shot in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance.



*Megan Matthews after being shot in the eye.*

76.    On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7, was struck four times by KIPs fired by DPD officers in the chest. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level.



*What the camera looked like after being shot.*

77. On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round while standing beside a professional cameraman from that station. The round struck Mr. Jojola's backpack.

78. On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer was standing in a group of press photographers when a law enforcement officer kicked a pepper gas canister directly into her face.



*Lindsay Fendt after having a tear gas canister kicked into her face.*

79.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with KIPs

without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a

medic to attend to those injured by the police. At one point, the Police excessive tear-gassed

a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it was a

cloud that could not be seen through. Mr. McDaniel saw a protester crawling out on his hands and knees. The protester was choking and could not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with KIPs. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause any injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls.

80.     On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a KIP without warning. Prior to the curfew, DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face.



*Elizabeth Epps after being shot in the face.*

81.    On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a KIP without

warning. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the back of a

DPD truck fired a projectile at his face without warning and blinded him in one eye. Mr.

Feldmann, a 21-year-old delivery driver with Denver's River Bear American Meats, was walking

about 9:30 p.m. from his friend's apartment at Grant Street and Colfax Avenue to his car parked

a block away on Sherman Street. It was the first night that Denver was under an 8 p.m. curfew

due to ongoing protests of police brutality, but Feldmann was trying to get home. There were no

large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or

throw anything at the DPD officers on the truck, which was marked with the DPD logo. Mr.

Feldmann didn't see what hit him, but that reached his hand up to his face and felt blood. His

friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. The surgeon who operated on Feldmann's eye told Mr. Feldmann's mother that the damage was consistent with a rubber bullet.



*Jax Feldmann after being shot in the eye.*

82.    On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a KIP without warning. Mr. Murphy's son was peacefully protesting in downtown Denver. After being shot, he was taken to the emergency room.



*Mr. Murphy's son after being shot in the eye.*

83.     On May 30, 2020, DPD officers without warning shot Russell Strong in the head

with a KIP. Mr. Strong was protesting near Civic Center Park and carrying a sign that read "No

justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a KIP. The force of

the KIP knocked him out. As a result of this use of force, Mr. Strong required several facial

reconstructive surgeries to repair broken bones around his eye and to realign the right side of his

jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot,

Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction.

84.     On May 31, 2020, Gabe Schlough was shot in the face with a KIP by DPD officers without warning. Mr. Slough, an individual with a degree in public health anthropology who some had medical training and had participated in protests before, attended the protests near the state Capitol with the intention of being there help anyone who was injured by the DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. They were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with KIPs. Mr. Slough described the sensation as getting his with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The KIP had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required 22 stitches to close the wound on his chin. He still experiences pain from this wound and will likely require plastic surgery for it to heal properly.



*Gabriel Schlough's chin after being shot.*

85.    On May 31, 2020, Zachary Packard was shot in the head with a KIP by DPD

officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at

about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the

groups of protesters. Mr. Packard heard a message from a SWAT vehicle that "curfew was in

effect." DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas

canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard

was hit in the head with a projectile. He was immediately knocked unconscious. DPD officers

did not issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard

from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took

him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and

jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for

about one week.



*Zachary Packard after being shot in the head*

86.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with

KIPs without warning. Well before curfew, Mx. Amghar was with other peaceful protesters on

the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding

signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax.

Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a

water bottle at the officers. The DPD officers immediately began shooting into the crowd with

pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot

indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at

Mx. Amghar, even though they were standing still with their hands up. The DPD officers first

shot them in the arms and legs, then in the chest, and then directly in the face, even though they

continued standing still with their hands up. The DPD officers shot them approximately 14 times.

The DPD officers did not give any orders before, during, or after this incident. No one told Mx.

Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD
officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn
U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at their
feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree.

87.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without
warning, by law enforcement and shot in the head and abdomen with KIPs. DPD officers fired at
Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right
abdomen.



*Alex Burness after being shot in the abdomen*

88.    On May 31, 2020, DPD officers shot Darian Tindall in the chest with KIPs without warning. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD.

89.    On May 31, 2020, DPD officers shot at Trevor Hughes face with KIPs without warning. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at approximately 8:30pm. While recording, with the camera near his face, DPD officers shot Mr. Hughes in the hand with a KIP. The shot broke and severed Mr. Hughes's right ring finger, leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes had to have his finger surgically repaired.

90.    On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning. As a photographer and freelance journalist, Mr. Cruz wanted to document the protests as well as the police response. Throughout the evening, he documented the protests and police action as a photojournalist. At about 8:00 p.m., he was with protesters in front of the Capitol. The protesters were chanting and peaceful. There were over 100 people present. There was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and foam bullets at the protesters. They did not give any warning or orders. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas. At approximately 13th Avenue, he saw a man in an electric wheelchair. The man was stuck and Cruz tried to give him a hand. However, the wheelchair was extremely heavy. Unfortunately, Cruz had to leave him there while he was being engulfed by tear gas. Mr. Cruz ran towards the library. Around 13th Avenue, the DPD officers were shooting at him and protesters with tear gas

and pepper balls. There were a lot of people who were trying to leave to go home. There were

approximately 35 people at that corner, and they were all younger protesters, including

teenagers. Almost all of them were Black. One protestor was having a seizure. Mr. Cruz and

others tried to help him. Some people tried to leave, but DPD officers cornered them and shot

pepper balls at them. A white person went up to the DPD officers to ask if they could leave

because people wanted to go home. The DPD officer said that they could go home, and so people

started walking towards where the officer told them to go. That officer started firing on people

and everyone started running. Mr. Cruz ran with other protesters to a building and garage at 13th

Avenue and Lincoln. The DPD officers tan after them. The DPD officers were shooting them

with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran down to the

garage but discovered that armored vehicles blocked off both ends of the block and there was no

exit. Cruz ran up the stairs, and as he looked up, a Defendant DPD Officer shot him in the face

with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses

off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to

fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the

other DPD officer continued firing pepper balls at him, including at the back of his head. The

DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him,

saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two

days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut,

and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and

other problems with his eyesight.

91.    Denver has not disciplined any officers for the above-outlined incidents. They

have provided no additional training to officers who used the above-outlined force against

peaceful protesters. This is indicative of Denver's customs, policies, practices, and training that condones the above-described force by its officers against peaceful protesters.

**DPD Officers Customarily Used Indiscriminate Force Against Protesters, and Those Assumed to be Protesters, Without Warning**

**May 28, 2020**

92.    DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 28, 2020.

93.    DPD officers also brutalized a group of protesters gathered near the intersection of 14th Avenue and Sherman Avenue. Protesters at this intersection encountered a line of DPD officers and stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protesters walked down 14th Avenue and joined this group of protesters. There were approximately 200 people. The officers tear gassed the entire crowd, without provocation or warning.

94.    DPD officers also brutalized an entire group of protesters near the Capitol building at about 6:30 p.m. At that time, DPD officers started launching tear gas canisters into a crowd of protesters without warning. At least one young man was hit with a canister. As soon as DPD officers launched the tear gas, the officers hopped on the back of a patrol van and drove away. Around 8 p.m., DPD officers returned to the Capitol building and formed a line. They slowly began advancing toward the protesters at the Capitol building. Without provocation or warning, the DPD officers launched tear gas at the crowd. At about 8:30 p.m., a crowd of protesters that was pushed down a street near the Capitol by DPD officers was tear gassed without any warning. At about 9 p.m., the crowd at that time was mostly seated on the Capitol steps talking amongst themselves. Then, without any warning or order to disperse, DPD officers deployed tear gas toward, and into, the crowd.

95.     Later that same night, DPD officers indiscriminately shot peaceful protesters with KIPs, including pepper balls and foam bullets.

**May 29, 2020**

96.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 29, 2020. In the evening, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" DPD police cars drive through the group and released tear gas and shot KIPs from the vehicles at peaceful protesters.

97.     Around approximately 4 p.m., DPD officers began firing KIPs, including rubber bullets and pepper balls, into the crowd of peaceful protesters every few minutes. They also threw flash bang grenades indiscriminately into the crowd every couple of minutes, which made deafening sounds. Protesters were not throwing any objects at officers or otherwise provoking the police violence that was visited upon them. After about an hour, DPD officers formed a riot line and crossed the street towards the protesters, shooting more pepper balls and rubber bullets. When this did not disperse the crowd, DPD officers released tear gas.

98.     There was no warning about enforcement of the curfew (which was newly implemented (which was newly implemented) before the curfew began. Instead, at 8:00 p.m., DPD officers came out of the Capitol building and launched tear gas, flash bang grenades, and/or pepper spray at the protesters indiscriminately and without warning or dispersal orders

99.     Around 8 p.m., DPD officers also shot projectiles directly at the cellphone of one protester who was using it to record and broadcast police violence to her thousands of social media followers, shattering it. Shortly after police shot this protester's phone, they deployed tear gas into the group of protesters without any warning or justification.

100.    At approximately 9 p.m., DPD officers set up a line of about ten canisters of tear

gas in front of the Capitol building and set them off. DPD officers did not issue a warning before

any of these weapons were used.

101.    Throughout the evening, DPD officers indiscriminately shot tear gas and KIPs at

the entire group of protesters anytime any single protester moved within approximately 15 feet of

the officers. DPD officers never gave any dispersal orders or warning before indiscriminately

shooting protesters with KIPs or tear gas throughout the evening.

102.    Officers shot tear gas and KIPs at peaceful protesters who were kneeling on many

occasions. Many of these protesters had their hands in the air and their shirts off. At many points,

when peaceful protesters were on the Capitol steps with their hands up, chanting "Hands up,

don't shoot," DPD officers fired flash bang grenades, tear gas, and KIPs into the crowd

indiscriminately and without warning.

**May 30, 2020**

103.    DPD officers used indiscriminate and excessive force against protesters gathered

at the Capitol building on May 30, 2020. In the afternoon, DPD officers sprayed tear gas over a

large area by the Capitol occupied by predominantly peaceful protesters, including children. In

response to a solitary protester tossing a water bottle toward the police, DPD officers deployed

tear gas without first issuing a warning. At about 3:30 p.m., DPD officer shot pepper balls at a

man who was kneeling in front of the officers with his arms raised. Later, DPD officers shot

more pepper balls as well as flash bang grenades at protesters. Other DPD officers pulled a boy's

goggles and mask off of his face before spraying him in the face with pepper spray. At 4 p.m.,

the crowd attempted to march north toward a line of officers at the Civic Center transit station,

and, in response, DPD officers deployed tear gas into the crowd without warning, sending them

running for their lives. At the same time, DPD officers dressed in riot gear standing near a DPD surveillance truck shot canisters of tear gas into the crowd. DPD officers did not offer a warning before firing the tear gas. No protester was being violent in any way, or threatening property destruction.

104.    Later, at about 5:30 p.m., there was a large crowd gathered outside of the Capitol building. A number of the peaceful protesters were on their knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and KIPs at the crowd without giving any warning. Shortly thereafter, officers shot protesters with KIPs, including rubber bullets, again.

105.    At about 7 p.m., officers formed a single file line and encircled Civic Center Park, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, one protester began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. As that protester was talking to other protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed that protester directly in his face with pepper spray. The DPD officer did not give any warning before spraying the pepper spray in his face.

106.    At about 7:50 p.m., ten minutes before the 8 p.m. curfew that Denver had instituted for the first time that day, numerous protesters attempted to leave the Capitol area to head to their cars, but DPD officers had barricaded the exits, trapping them. Approximately five minutes later, while the peaceful protesters were still trapped and before the curfew began, officers sprayed tear gas into the crowd, again without warning or an order to disperse.

107.    At approximately 9 p.m., DPD officers started pushing protesters out of the

Capitol building area. Officers began using teargas and shooting projectiles indiscriminately at

the crowd, including at women and children. There was no provocation or threatening behavior

by the crowd, and no warnings from the officers before they shot the projectiles. Later into

curfew, DPD officers continued to use indiscriminate force without warning. This included

pepper-spraying individuals who were standing on their own property and shooting individuals

with KIPs who yelled, from their front porches, for the officers to leave the neighborhood.

108.    Throughout the night, after curfew, there were roving gangs of DPD officers in

riot gear, hanging off of vans and pickups trucks, driving around shooting protesters with KIPs.

These officers were randomly, and indiscriminately, drive-by shooting citizens who were outside

in the areas near the Capitol, in the Capitol Hill neighborhood, and on and around Broadway.

There were no warnings given before these DPD officers shot KIPs and tear gas canisters at

protesters and bystanders alike.

**May 31, 2020**

109.    DPD officers used indiscriminate and excessive force against protesters gathered

at the Capitol building on May 31, 2020. In the evening, while peaceful protesters were chanting

and marching on the streets surrounding the Capitol, and some protesters at the front of the

march were lying down in the street like George Floyd (but none were throwing items or being

violent), DPD officers gassed the protesters without warning. Later, at about 9:30 p.m., a group

of approximately 250 peaceful protesters were marching near the Capitol. Without warning, four

SWAT cars pulled in on both sides of the marching crowd, "kettling" them between two side

streets. The DPD officers in the SWAT vehicles released tear gas from both directions without

warning. Most protesters remained trapped in the cloud of gas.

110.    After curfew, DPD officers consistently trapped peaceful protesters in corners or between lines of officers, so that they could pelt them indiscriminately with KIPs.

**June 1, 2020**

111.    DPD officers used indiscriminate and excessive force against protesters gathered at the Colorado state Capitol building on June 1, 2020. Throughout the day and into the night, the protest was completely peaceful. At about 8:00 p.m., there were approximately 100 peaceful protesters in front of the Capitol. DPD officers formed a line in front of the Capitol and began pushing the peaceful crowd into the street and other officers surrounded the peaceful protesters on all sides. Once the protesters were successfully kettled, DPD officers released tear gas without warning. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape.

112.    Around midnight, dozens of DPD officers came out of the shadows at the Capitol building, and a group of protesters began chanting, "Why are you in riot gear, I don't see no riot here." Protesters lay down in the street with other people linking arms. There were also protesters demonstrating against the police in a line. DPD officers began marching onto the lawn. Without any warning or dispersal order or any words, the DPD officers began tear-gassing the demonstrators. DPD officers also used a noise cannon without warning.

113.    As a result, a number of individuals who were attending the protests as medics left the protest. The group of medics that fled encountered approximately 50 DPD officers at the intersection of Lincoln and Broadway. DPD officers surrounded the medics, pushed them into a corner and began dousing them with pepper spray. The medics in front were wearing gear clearly identifying them as medics.

**June 2, 2020**

114.    DPD officers used indiscriminate and excessive force against protesters gathered on June 2, 2020. That night, DPD officers again released tear gas into the crowd of protesters without warning and shot KIPs, including pepper balls, at protesters. DPD officers utilized the same tactics they had used the previous five nights.

**Federal Judge R. Brooke Jackson Holds that Denver's Actions Violated the Constitution.**

115.    On Thursday, June 4, 2020, four persons who participated in the Denver protests since they began sued Denver, alleging that DPD officers' use of "less-lethal" weapons violated the First and Fourth Amendments. After a hearing on the matter, United States District Court Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order restricting DPD and jurisdictions invited by DPD from using "less-lethal" projectiles and chemical agents on peaceful protesters. *See Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020).

116.    In doing so, Judge Jackson noted that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, Judge Jackson was unequivocal about the behavior of DPD officers toward protesters, calling it "disgusting."

117.    Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc.… solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render

treatment to injured protesters." Judge Jackson found it particularly problematic that "officers specifically aimed at heads and groins, causing broken facial bones and ruptured testicles." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

118.    Judge Jackson also held that there was a "strong likelihood" that DPD officers had violated the First Amendment in their treatment of peaceful protesters. In doing so, he found that: (1) the protesters "were engaged in constitutionally protected activity through organized political protest"; (2) DPD officers' "use of excessive force likely caused injury sufficient to chill a person of ordinary firmness from continuing to engage in that political protest" because "[o]fficers used physical weapons and chemical agents to prevent not just peaceful demonstration, but also the media's ability to document the demonstrations and plaintiffs' and third parties' ability to offer aid to demonstrators" resulted in "[p]eaceful demonstrators' legitimate and credible fear of police retaliation" that was "silencing their political speech—the very speech most highly valued under the First Amendment."

119.    Judge Jackson also made it a point to note that although he did "not agree with those who have committed property damage during the protests, property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice. If a store's windows must be broken to prevent a protestor's facial bones from being broken or eye being permanently damaged, that is more than a fair trade. If a building must be graffiti-ed to prevent the suppression of free speech, that is a fair trade. The threat to physical safety and free speech outweighs the threat to property.

120.    Ultimately, Judge Jackson issued a temporary restraining order **banning** DPD officers, and those under their command, from shooting KIPs in a way that targets the "head,

pelvis, or back" and from shooting KIPs "indiscriminately into a crowd." Judge Jackson also

ordered that DPD were **required** to issue an order to disperse prior to using any chemical agents

and that that order had to be followed "with adequate time for the intended audience to comply"

and allow for egress.

121.    The incident involving Mr. Hampton was presented to Judge Jackson at the

temporary restraining order hearing and Judge Jackson's order in *Abay* was based on the actions

of the officers with respect to Mr. Hampton.

**The Actions of the Law Enforcement Officers During the Protests Were Ordered by
Denver's Final Policymakers**

122.    Upon information and belief, DPD officers were given authority by Denver's final

policymakers, including Chief Pazen, to use KIPs, including pepper balls, to shoot protesters

without warning.

123.    Upon information and belief, DPD officers were given authority by Denver's final

policymakers, including Chief Pazen, to use KIPs, including pepper balls, to shoot protesters in

the head, face, and chest.

124.    Upon information and belief, DPD officers were given authority by Denver's final

policymakers, including Chief Pazen, to use KIPs, including pepper balls, to shoot at completely

peaceful protesters.

**DPD Officers Continually Violate Official Policy with No Repercussions.**

125.    Denver's own use of force policy restricts the use of pepper balls to only

situations where there is Defensive Resistance or above. Additionally, pepper balls may only be

targeted below the sternum. Unless lethal force is dictated by the circumstances, pepper balls

cannot be shot at the head, eyes, throat, neck, breasts of a female, genitalia, or spinal column.

And, under the policy, officers must be given clear and concise verbal commands to the targeted individual prior to, during, and after the deployment of pepper balls.

126.    DPD officers violated these policies with impunity during the protests, relegating the use of force policy to meaningless pieces of paper sitting on a dusty shelf. Upon information and belief, no officer has been disciplined for blatantly violating this policy.

127.    DPD officers violated these policies with respect to Mr. Hampton, but no officer was ever disciplined. This demonstrates that Denver has an unofficial custom and practice of tolerating its officers violating the use of force policy with respect to pepper balls, and that it has a custom and practice of allowing its officers to target the head and neck with pepper balls, and fire pepper balls without providing any warning.

128.    Denver's and Chief Pazen's continued failure to discipline, supervise, and/or reprimand its officers for their repeated violation of the use of force policy effectively communicated to DPD officers that such force was consistent with Denver's customs, policies, practices, and training.

129.    DPD officers continued flagrant violation of the use of force policy demonstrates that Denver and Chief Pazen fail to train and/or supervise its officers on this policy and/or provides training and/or supervision that this policy does not need to be followed.

130.    The existence of the use of force policy demonstrates that Denver and Chief Pazen were on notice that they needed policies in place to control the use of pepper balls, but were deliberately indifferent to the actions of DPD officers who used pepper balls in such a way as to constitute excessive force under the constitution.

**<u>Denver's customs, policies, practices, training, and supervision caused the violation of Mr. Hampton's constitutional rights.</u>**

131.     Additionally, DPD officers' customary and ongoing use of KIPs, including pepper balls, to target protesters for demonstrating, an improper purpose under the policy, demonstrates that Denver and Chief Pazen failed to adequately train their officers that KIPs, including pepper balls, cannot be used for the purpose of discouraging First Amendment activity, to punish those who engage in First Amendment activity, or to retaliate against those who engage in First Amendment activity.

132.     Denver final policymakers, including Chief Pazen, have received ample notice that DPD officers were using KIPs, including pepper balls, against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period,[12] condemnation from City Council members,[13] and widely publicized videos and firsthand accounts circulated through the local, state, and international press.[14]

---

[12] Jesse Paul, *Complaints about police response to Denver's George Floyd protests under investigation as demonstrations hit day 6*, Colo. Sun, June 2, 2020, https://coloradosun.com/2020/06/02/denver-police-response-protests-under-investigation/.
[13] Conrad Swanson, *Denver City Council members call for investigation into police use of force during George Floyd protests*, Denver Post, June 2, 2020, https://www.denverpost.com/2020/06/02/denver-city-council-investigate-police-force-protest/; Letter, Denver City Council, June 5, 2020, https://denver.cbslocal.com/wp-content/uploads/sites/15909806/2020/06/Denver-city-council-calls-for-review-of-DPD-use-of-force-policy.pdf.
[14] Lori Jane Gliha, *Police projectile fractures Denver protester's face; she says it was unprovoked*, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked; Alex Rose, *Local man needs eye removed after projectile hits his face during afternoon protest in Denver*, KDVR, June 3, 2020, https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA.

41

133.     Denver decision makers, including Chief Pazen, have also received notice that the actions of DPD officer in Denver against protesters violated the policies and procedures for the use of force outlined in the DPD's own Operations Manual.

134.     Moreover, Denver and Chief Pazen are responsible for the actions of any non-DPD officers whose services were utilized during the period in which protests were ongoing. By utilizing those services, Denver and Chief Pazen were required to ensure that all officers complied with both protesters' constitutional rights and Denver's use-of-force policies.

135.     On May 29, 2020, after only the first day of protests, Denver final policymakers, including Chief Pazen, publicly ratified DPD officers' use of KIPs, including pepper balls, for crowd control at protests without warning and DPD officers shooting KIPs, including pepper balls, at protesters head, neck, and chest.[15] This ratification gave DPD officers notice that these actions were consistent with Denver custom, policy, and practice.

136.     The violations of Mr. Hampton's constitutional rights are a direct result of and caused by Denver's (and Chief Pazen's) policy, practice, and custom of authorizing DPD officers to use KIPs, including pepper balls, aimed at protesters head, neck, and face, without warning, to control and suppress protests.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom of Speech and Assembly
### (Plaintiff against Defendants)

---

[15] Ana Campbell, *Denver law enforcement agencies have a long history of violence. A use-of-force policy is supposed to help*, Denverite, https://denverite.com/2020/05/29/denver-law-enforcements-long-sordid-history-of-violence/; Ryan Osborne, *Denver mayor, police chief says officers showed "restraint" during George Floyd protest*, Denver Channel, May 29, 2020, https://www.thedenverchannel.com/news/local-news/denver-mayor-police-chief-say-officers-showed-restraint-during-george-floyd-protest.

137.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

138.    Defendants, acted under color of state law, and within the course and scope of their employment, in their capacities as officers of the DPD at all times relevant to the allegations in this Complaint.

139.    Defendants are "persons" under 42 U.S.C. § 1983.

140.    Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

141.    The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

142.    Plaintiff's expression was on a matter of public concern and did not violate any law.

143.    Plaintiff's expression occurred at a traditional public forum.

144.    Plaintiff assembled with others at a traditional public forum to express shared concerns about police brutality.

145.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression and assembly.

146.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

147.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

148.     At the time when Defendants stopped Plaintiff from speaking and gathering, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express himself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

149.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

150.     Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

151.     Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

152.     The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

153.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

154.     Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

155.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

156.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

157.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Violation — Retaliation**
**(Plaintiff against Defendants)**

158.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

159.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

160.     Defendants are "persons" under 42 U.S.C. § 1983.

161.     Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

162.     The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

163.     Plaintiff's expression was on a matter of public concern and did not violate any law.

164.     Plaintiff's expression occurred at a traditional public forum.

165.     Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation, including but not limited to use of physical force, including KIPs and chemical agents.

166.    By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence him, and to deter him from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

167.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

168.    At the time when Defendants retaliated against Plaintiff for exercising his First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

169.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

170.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

171.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

172.    Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

173.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

174.    The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

175.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

176.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

177.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

178.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Excessive Force**
**(Plaintiff against Defendants)**

179.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

180.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

181.    Defendants are "persons" under 42 U.S.C. § 1983.

182.    Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

183.    Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

184.    Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents and KIPs.

185.    Defendants had no warrant authorizing any seizure of Plaintiff.

186.    Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights and is thereby liable for such failure to intervene.

187.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

188.    Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

189.    Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

190.    Defendants recklessly created the situation in which they used force.

191.    Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

192.    At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

193.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

194.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

195.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

196.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

197.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

198.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

199.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

200.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Excessive Force**
**(Plaintiff against Defendants)**

201.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

202.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

203.    Defendants are "persons" under 42 U.S.C. § 1983.

204.    Plaintiff had a protected Fourteenth Amendment Substantive Due Process interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

205.    Defendants did not have, at any time, a legally valid basis to use force against Plaintiff.

206.    Defendants' use of force was extremely disproportionate.

207.    Defendants acted with malice and/or excessive zeal amounting to an abuse of power.

208.    Defendants acted for the purpose of causing harm unrelated and unnecessary to any relevant policing objective.

209.    Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

210.    Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

211.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

212.    At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States

Constitution to be secure from excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

213.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

214.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

215.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

216.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

217.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

218.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Due Process**
**(Plaintiff against Defendants)**

219.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

220.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

221.    Defendants are "persons" under 42 U.S.C. § 1983.

222.    The orders issued by Defendants, and the authority on which those orders were based, were vague and not clearly defined.

223.    The orders issued by Defendants, and the authority on which those orders were based, offered no clear and measurable standard by which Plaintiff and others could act lawfully.

224.    Defendants lacked legal authority, through Denver municipal ordinance, state law, or otherwise, to order the dispersal of Plaintiff and, thereby, there were no explicit standards to govern the order of dispersal or limits on law enforcement's authority to order dispersal.

225.    Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

226.    The orders issued by Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory enforcement, or both.

227.    At the time when Defendants violated Plaintiff's due process rights, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be afforded due process of law. Any reasonable law enforcement officer knew or should have known of this clearly established right.

228.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

229.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

230.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

231.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

232.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

233.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

234.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.    All appropriate relief at law and equity;

B.    Injunctive relief, including:

     a.    Enjoining Defendants from using chemical agents, including pepper spray, against those exercising their rights of free speech and assembly;

     b.    Enjoining Defendants from shooting projectiles indiscriminately into crowds of those exercising their rights of free speech and assembly;

     c.    Enjoining Defendants from shooting projectiles at protesters unless there is an immediate threat of bodily injury to the protester, or others;

     d.    Requiring all Defendant law enforcement officers deployed to police demonstrations must have their body-worn cameras recording at all times, and forbidding officers from intentionally obstructing the camera or recording;

     e.    Requiring that all Defendant law enforcement officers deployed to police demonstrations must create a use of force report documenting every single deployment of KIPs, tear gas, or any other less-than-lethal weapon;

     f.    Requiring that any and all orders to disperse must only be given when there is imminent danger of harm to persons (not property);

     g.    Requiring that any and all orders to disperse must be followed by adequate time for the intended audience to comply, and officers must leave room for safe egress; if it appears the intended audience did not hear the order, the order must be repeated multiple times before the crowd is dispersed.

C.    Declaratory relief and other appropriate equitable relief;

D.    Economic losses on all claims as allowed by law;

E.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.    Punitive damages on all claims allowed by law and in an amount to be determined

at trial;

G.    Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988,

including expert witness fees, on all claims allowed by law;

H.    Pre-and post-judgment interest at the lawful rate; and

I.    Any other appropriate relief at law and equity that this Court deems just and

proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 10th day of March 2022.

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*
Andy McNulty
Darold W. Killmer
Reid Allison
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
amcnulty@kln-law.com
dkillmer@kln-law.com
rallison@kln-law.com

ATTORNEYS FOR PLAINTIFF