**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00594-DDD

DARRELL HAMPTON

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO;
CHIEF OF POLICE PAUL PAZEN, in his individual capacity;
OFFICER JOHN ALLRED, in his individual capacity;
SERGEANT JASON SIMMONS, in his individual capacity;
SERGEANT CARLA HAVARD, in her individual capacity,

      Defendants.

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND
---

      Plaintiff Darrell Hampton, by and through his attorney Andy McNulty, respectfully alleges for his First Amended Complaint and Jury Demand as follows:

### <u>INTRODUCTION</u>

      1.      Following the death of George Floyd on May 25, 2020, Darrell Hampton joined protesters in Denver and across the county in voicing their opposition to an epidemic of law enforcement violence against people of color. They said the names of not just George Floyd and Breonna Taylor, but also chanted the names of lives lost to police brutality closer to home, including Elijah McClain, Jessica Hernandez, Marvin Booker, and Michael Marshall.

      2.      While speaking out against police brutality, Mr. Hampton, a Black man, became a victim of the same police brutality he was protesting.

3.      Mr. Hampton attended the peaceful Denver protest for Black lives on May 30, 2020 with two friends. Mr. Hampton attended with the intention of exercising his First Amendment rights but instead was confronted with what would turn out to be a hallmark of the Denver protests: escalation, intimidation, and the excessive use of force by the Denver Police Department ("DPD"). Mr. Hampton was shot in the face with a pepper ball by a DPD officer while simply standing on the sidewalk using his smartphone to record the overly militarized response by DPD officers to a peaceful protest. This excessive use of force violated Mr. Hampton's constitutional rights.

4.      The City and County of Denver's ("Denver") actions, while unconstitutional in any context, are even more pernicious here because the use of excessive force has specifically targeted peaceful demonstrators who assembled to protest police violence and brutality, including in particular police brutality that disproportionately targets Black Americans.

5.      Plaintiff demands that Denver and its police department accept and act in accordance with the principle that Black lives matter equally in our society and stop using indiscriminate or unlawfully targeted force against peaceful protesters exercising their First Amendment rights to assemble, speak, and petition their government for a redress of grievances.

## PARTIES

6.      At all times pertinent to the subject matter of this litigation, Plaintiff Darrell Hampton was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

7.      Defendant Denver is a Colorado municipal corporation.

8.      At all times pertinent to the subject matter of this litigation, Defendant Paul Pazen was a citizen of the United States and resident of and domiciled in Colorado. At all times

pertinent, Defendant Pazen was acting under color of state law in his capacity as Chief of Police of Denver. Defendant Pazen was responsible for supervising Defendants John Allred and Carla Havard and directing their actions during the protests in response to the murder of George Floyd and, specifically, their actions during the protest on May 30, 2020.

9.      At all times pertinent to the subject matter of this litigation, Defendant John Allred was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Allred was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD.

10.      At all times pertinent to the subject matter of this litigation, Defendant Jason Simmons was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Simmons was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD. Defendant Simmons was responsible for supervising Defendant Allred and directing his actions during the protests in response to the murder of George Floyd and, specifically, his actions during the protest on May 30, 2020

11.      At all times pertinent to the subject matter of this litigation, Defendant Carla Havard was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Havard was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer employed by the DPD. Defendant Havard was responsible for supervising Defendant Allred and directing his actions during the protests in response to the murder of George Floyd and, specifically, his actions during the protest on May 30, 2020

**JURISDICTION AND VENUE**

12.     This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

13.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

## FACTUAL ALLEGATIONS

### The murders of George Floyd and Breonna Taylor, which were just the latest examples of longstanding police racism and violence, were a tipping point that led to mass protests in May and June of 2020.

14.     Eight minutes and forty-six seconds. That's how long Minneapolis Police Officer Derek Chauvin suffocated George Floyd by kneeling on his neck. On May 25, 2020, George Floyd's name joined the long list of social media hashtags that have become synonymous with state-sanctioned murders of Black Americans. This list is as extensive as it is devastating, and includes the following Black men and women who have been murdered by police officers.

15.     Breonna Taylor was shot eight times and killed by three plainclothes officers in Louisville, Kentucky, who entered her home in the middle of the night to execute a no-knock warrant.

16.     Elijah McClain was killed by Aurora police officers while walking down a street unarmed and dancing to music.

17.     De'Von Bailey was shot in the back and killed by Colorado Springs police.

18.     Michael Marshall was killed by Denver sheriff deputies after asphyxiating on his own vomit while being restrained for eleven minutes.

19.     Marvin Booker was killed by Denver sheriff deputies who shocked him with a Taser, put him in a sleeper hold and hit him with nunchucks as they pinned him to the floor.

20.     Laquan McDonald was fatally shot in the back by a Chicago police officer.

21.     Freddie Gray was given a "rough ride" by Baltimore police officers and died a week after suffering a severe spinal injury in a Baltimore Police Department van.

22.     Aiyana Stanley-Jones was shot and killed in a raid by the Detroit Police Department.

23.     Botham Jean was fatally shot in his own apartment by an off-duty officer of the Dallas Police Department.

24.     Yvette Smith was fatally shot by a sheriff's deputy in Bastrop County, Texas.

25.     Alton Sterling was fatally shot by an officer in the Baton Rouge Police Department.

26.     Tamir Rice, a Black child, was killed by a Cleveland police officer.

27.     Philando Castile was fatally shot during a traffic stop by a police officer from St. Anthony, Minnesota.

28.     Stephon Clark was shot and killed in the backyard of his grandmother's house by two officers of the Sacramento Police Department.

29.     Walter Scott was shot in the back and killed by a North Charleston police officer after being stopped for a nonfunctioning brake light.

30.     Michael Brown was fatally shot by a police officer in Ferguson, Missouri.

31.     This list of Black Americans killed by police is not an exhaustive one, as compiling one would be nearly impossible. Similarly difficult to create is a list of the countless law enforcement officers that have gone unpunished for the murders of these countless victims.

32.     Because of the long-simmering outrage for an unchecked and racist system of policing that spans this country, it took only one day after the death of George Floyd for the city of Minneapolis to take to the streets in defense of Black lives.

33.     It took only three days for the people of Denver to join their fellow Americans and begin what would become over a week of near-constant, and nearly five months of intermittent but consistently peaceful protests against police brutality. Coloradans stood in solidarity with the Black community across this nation. Those who spoke out and exercised their First Amendment rights were met with the very brutality they were protesting.

**Mr. Hampton takes to the streets in honor of George Floyd, and the countless other Black Americans who have been murdered by racist police officers.**

34.     On May 30, 2020, Mr. Hampton joined the peaceful protests that erupted across the country in solidarity with the fight for Black lives. Mr. Hampton attended the peaceful protest against police brutality with two friends near the Colorado State Capitol.

35.     After participating in the peaceful protest throughout the day, Mr. Hampton was standing on the sidewalk near the intersection of Fourteenth Street and Lincoln Avenue at approximately 5:30 p.m. Mr. Hampton was on west sidewalk of Lincoln Avenue across from the Capitol. He was exercising his First Amendment rights on that sidewalk through his participation in the ongoing protest against police brutality.

36.     While standing on the sidewalk, Mr. Hampton observed a group of heavily armed and armored DPD officers pull up in the street on the back of a DPD vehicle.

37.     Among the DPD officers on the back of the vehicle were Defendants Allred, Havard, and Simmons. Defendant Allred was armed with a pepper ball gun. Defendant Simmons was Defendant Allred's direct supervisor and in charge of pointing out individuals in the crowd for Defendant Allred to shoot with pepper balls. Defendant Havard was directing the officers on the back of the truck who had less-lethal weapons, including pepper ball guns, who to shoot.

38.     Mr. Hampton looked around and saw the stark contrast between the peaceful protesters gathered at the Capitol, and the DPD officers who were geared for war.

39.     Mr. Hampton decided to document the overly militarized response to a peaceful protest in support of Black lives. The protesters, including Mr. Hampton, were there protesting the very militarization of police that the DPD officer's presence and appearance was symbolic of.

40.     Mr. Hampton pulled out his cell phone and began recording the officers from the sidewalk on the west side of Lincoln Street across from the Capitol.

41.      The officers on the back of the vehicle, including Defendants Allred, Simmons, and Havard, observed Mr. Hampton recording their activity with his smartphone.

42.     Upon observing Mr. Hampton recording him, Defendant Allred aimed his pepper ball gun directly at Mr. Hampton; specifically, at Mr. Hampton's face. Defendant Allred targeted Mr. Hampton because he was recording the police and was part of a crowd that was protesting the police, including DPD officers. There was no other basis for targeting Mr. Hampton, as he was simply standing on a public sidewalk during a protest against the police filming DPD officers.

43.     Then, without issuing any warning whatsoever, Defendant Allred fired a pepper ball directly at Mr. Hampton's face. The pepper ball struck Mr. Hampton's phone, which he was holding directly in front of his head. When the pepper ball struck Mr. Hampton's phone it exploded into his face.

44.     Below is a still taken from the video Mr. Hampton was recording at the time of the incident. In that still, you can see Defendant Allred pointing directly at Mr. Hampton's face.



*Defendant Allred specifically targeting Mr. Hampton.*

45.     The moment before and after Mr. Hampton was shot was captured by a bystander. It is clear that Mr. Hampton was standing on the public sidewalk and peacefully exercising his First Amendment rights. In the second photo, you can see the pepper ball strike Mr. Hampton's phone, which was directly in front of his head, and explode into his face. Tellingly, there is no one directly next to, or behind, Mr. Hampton when he is shot by Defendant Allred. The positioning of Defendant Allred's pepper ball gun in the picture above, and the positioning of Mr. Hampton in the picture below, demonstrates that Defendant Allred purposefully targeted Mr. Hampton, who was simply recording the officers on his phone.



*Mr. Hampton, on the right in a hooded sweatshirt and backpack, exercising his First Amendment rights while Defendant Allred directly targets him.*



*Mr. Hampton after being hit in the face with Defendant Allred's pepper ball.*

46.     After being struck with the pepper ball, Mr. Hampton fell to the ground. His face burned from the pepper ball and he was disoriented. He was eventually helped up by fellow demonstrators who moved him away from the officers. Another protestor poured milk on Mr. Hampton's face to calm the irritation caused by the pepper ball. Below Mr. Hampton can be

seen, on the right side of the photograph, after being doused in milk but still suffering the effects of the pepper ball.



*Mr. Hampton almost immediately after having been shot by Defendant Allred.*

47.     Mr. Hampton's face burned for hours after he was shot. Being shot with the pepper ball caused him bruising and physical pain and suffering.

48.     The pepper ball broke Mr. Hampton's phone.

49.     Defendants Allred, Simmons, and Havard never issued any order to disperse prior to authorizing the use of, and actually using, the pepper ball gun against Mr. Hampton.

50.     Defendants Simmons and Havard gave Defendant Allred the authority to utilize his pepper ball gun against the peaceful protesters, including Mr. Hampton. Both Defendant Simmons and Havard were pointing out members of the crowd for Defendant Allred to shoot with pepper balls.

51.     Defendant Simmons stood by and did nothing to intervene to prevent Defendant Allred from shooting Mr. Hampton. It was clear that Defendant Allred was targeting Mr.

Hampton, as he directly pointed his pepper ball gun at Mr. Hampton's face. Defendant Simmons had the opportunity to intervene to stop Defendant Allred from pulling the trigger, but refused to do so.

52.     When he was shot, and throughout the entirety of the time he was protesting on May 30, 2020, Mr. Hampton was not participating in any activity that could be characterized as threatening towards the DPD law enforcement officers at any point in the interaction. Mr. Hampton never committed any crime. Mr. Hampton never engaged in any property damage or engaged in any activity that could be construed as threatening to destroy any property. Mr. Hampton never engaged in any violence or engaged in any activity that could be construed as threatening to violence to anyone.

53.     Shortly after being shot with the pepper ball by DPD, Mr. Hampton and his friends left the demonstration. A reasonable person in Mr. Hampton's position would have left the demonstration after being shot in the face with a pepper ball.

54.     Mr. Hampton was merely filming a police officer, protesting police brutality, and gathering in remembrance of George Floyd when he was shot. He was standing at a distance from the officers on a sidewalk. There was absolutely no justification for using any force on Mr. Hampton, let alone shooting him in the face with a pepper ball.

**In accordance with Denver's customs and practices throughout the George Floyd protests, and the decisions of supervisory Defendants Pazen, Simmons, and Havard, Defendant Allred utilized the pepper ball gun on May 30, 2020 without proper training and certification.**

55.     It is standard practice for police departments to manage the risks involved with pepper ball guns, including serious injury and death, by ensuring that only officers who are certified and trained may deploy this weapon. In accordance with this, the International Association of Chiefs of Police Model Crowd Management Policy requires that in all cases,

weapons like pepper ball guns should be carried and deployed only by trained and authorized officers. Manufacturers of pepper ball guns agree. In their pepper ball gun user manual, United Tactical Systems states that an officer must be fully trained on pepper ball guns before being allowed to use them.

56.     Within the DPD, commanding officers are required to ensure that the officers working underneath them possess adequate training prior to allowing them to utilize pepper ball guns. Ultimately, it is the responsibility of Defendant Pazen to ensure that DPD officers are trained and certified to use the weapons that they carry and deploy, including pepper ball guns.

57.     At the time that Defendant Allred shot Mr. Hampton with the pepper ball gun, he was not certified to operate that weapon. Defendant Allred had not received proper training on the pepper ball gun when he shot Mr. Hampton. Defendant Allred is not listed on the certified officer list as having been trained to safely operate a pepper ball gun.

58.     Only after he shot Mr. Hampton, in July of 2020, did Defendant Allred receive the training necessary for him to be authorized to operate the pepper ball gun.

59.     Defendants Pazen, Simmons, and Havard allowed Defendant Allred to utilize the pepper ball gun despite knowing that he had not been adequately trained to operate the pepper ball gun and was not authorized to do so under DPD's policies and training. Their decision to allow Defendant Allred to use a weapon he had not been adequately trained on, and was not certified to operate, caused the violation of Mr. Hampton's Constitutional rights. Defendants Pazen, Simmons, and Havard failed to intervene to prevent Defendant Allred from utilizing a weapon he was not properly trained or certified to use, which caused the violation of Mr. Hampton's Constitutional rights.

60.     Throughout the protests, Defendants Denver and Pazen allowed officers, including Defendant Allred, to operate weapons that they were not trained, or certified, to operate, including pepper ball guns, 40mm launchers, grenades, and other less-lethal weapons. In a report by Denver's Independent Monitor after the George Floyd protests, it was found that DPD officers overseen by Defendant Pazen routinely utilized weapons they were not certified to operate and used these weapons against protesters.

61.     Defendants Denver and Pazen customarily allowed uncertified officers who lacked the necessary training to use weapons capable of deadly force, and serious injury, against protesters throughout the George Floyd protests.

**Denver's decision to clear Defendants Allred and Havard of any wrongdoing and ratify their conduct demonstrates that Defendants Allred's and Havard's conduct was in accordance with Denver's customs, policies, practices, and training.**

62.     Consistent with Denver's longstanding pattern in response to officers who use excessive force against protesters, and particularly its officers use of force against protesters during the George Floyd protests, Denver did not impose *any* discipline against Defendants Allred, Simmons, and Havard for their actions.

63.     Defendant Havard, who was one of the officers charged with supervising Defendant Allred, testified during her internal affairs interview and the *Abay* temporary restraining order hearing that Defendant Allred's use of force against Mr. Hampton was consistent with Denver policy and training.

64.     Upon information and belief, Denver has provided no additional training to any Defendant, or other Denver officers, related to the incident with Mr. Hampton.

65.     Through Denver's unlawful conduct of condoning the conduct of Defendants Allred and Havard, Denver ratified the unconstitutional practices of Defendants Allred and Havard.

**DPD officers used potentially deadly force against Mr. Hampton.**

66.     DPD officers used a number of Kinetic Impact Projectiles ("KIPs") against peaceful protesters, including Mr. Hampton, during the protests. These KIPs included foam bullets, beanbag rounds, pepper balls, and tear gas canisters.

67.     KIPs have a larger surface area than other ammunition, and thus they take unpredictable flight paths and reduced accuracy is inevitable.[1]

68.     It is extremely common for KIPs to cause contusions, abrasions, and hematomas.[2] Additionally, blunt impact may cause internal injuries.[3]

69.     Fatalities may occur when impact is at the head, neck, or precordium (the region of the chest immediately in front of the heart).[4]

70.     According to a systematic review of available literature, three percent of those injured by KIPs died from their injuries.[5] Fifteen percent of 1,984 people studied were permanently injured by them.[6]

---

[1] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.; *Kinetic Impact Projectiles*, Physicians for Human Rights, https://phr.org/wp-content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf.
[2] W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.
[3] *Id.*
[4] *Id.*
[5] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.
[6] *Id.*

71.     DPD officers shot pepper balls at peaceful protesters and bystanders, like Mr. Hampton. Pepper balls have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.[7]

72.     In addition to the burning effect of the OC contained in the pepper balls, the balls themselves can cause serious injury—even death—because of the high velocity at which they are shot. The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second, or more than 238 miles per hour.[8]

73.     The Boston Police Department suspended use of pepper balls in 2004 after a college student was killed when a pepper ball struck her in the eye.[9]

74.     University of California, Davis police shot a pepper ball at an unarmed student while trying to break up a block party and permanently damaged his eye in 2004.[10]

75.     Denver itself has been called on, and conducted an internal investigation on, whether to end the use of pepper balls after they were used in response to Occupy demonstrations in October of 2011.

---

[7] Florida Gulf Coast University, Weapons & Equipment Research Institute, *Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis* (2008).

[8] 2019 Product Catalog, PepperBall, https://www.pepperball.com/wp-content/uploads/2019/01/PepperBall-2019-product-catalog.pdf.

[9] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, Wash. Post, Oct. 24, 2004, https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5.

[10] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. Times, July 12, 2012, https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.

76.      Since the protests began on May 28, 2020, at least 60 protesters nationwide sustained serious injuries from the use of "less-lethal" weapons by law enforcement, including "a broken jaw, traumatic brain injuries, and blindness."[11]

77.      DPD officers' use of KIPs, including pepper balls, against peaceful protesters, was approved, condoned, and ratified by Denver and Chief Pazen. DPD officers were given specific authorization to use these KIPs, including pepper balls, on completely peaceful protesters by Denver and Chief Pazen.

**DPD officers have a history of indiscriminately shooting crowds of peaceful protesters with KIPs.**

78.      On October 29, 2011, Denver police officers responded to a peaceful protest by indiscriminately shooting protesters with KIPs, including pepper balls. Denver police officers fired a number of these rounds at people who were lawfully dispersing. Not only did Denver police officers shoot KIPs, including pepper balls, indiscriminately into the crowd of peaceful protesters, but they also routinely targeted individuals' faces. For example, Denver police officers shot Philip Becerra in the face with a pepper ball. Mr. Becerra suffered facial injuries on the bridge of his nose, less than an inch from his left eye. Mr. Becerra could have easily been blinded in that eye, or even killed, by this indiscriminate use of force

79.      After the October 29, 2011 incident, the ACLU of Colorado sent a letter outlining the concerns associated with the use of indiscriminate force by DPD officers to Denver.

80.      Despite being notified of these grossly excessive uses of force and the widespread nature of it, upon information and belief, Denver did not provide further training to their officers

---

[11] Kaiser Health News, *Fractured skulls, lost eyes: Police often break own rules using "rubber bullets"*, Denver Post, June 23, 2020, https://www.denverpost.com/2020/06/23/george-floyd-protests-rubber-bullet-injuries.

or discipline any officer involved. Denver's ratification of this indiscriminate use of force by its officers signaled to DPD officers that such force was consistent with Denver's customs, policies, practices, and training, and that DPD officers can use such force without any risk of discipline.

**DPD officers purposefully and customarily shot protesters, and those assumed to be protesters, in the head, neck, face, and chest with KIPs.**

81. On May 28, 2020, Michael Acker, a young Black college student, was peacefully protesting in a march from the Capitol building to I-25. There, he watched from the pedestrian bridge as other protesters marched onto I-25. DPD officers formed a police line on the west side of Platte Street near the pedestrian bridge. At this point, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask that someone had given him and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a KIP at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. Over a month after the injury, Mr. Acker continued to experience foggy vision, light sensitivity, inability to read, and difficulty tracking movement in his right eye.



*Mr. Acker moments after being shot in the eye.*

82.     On May 28, 2020, while he was covering the protests rally at the State Capitol.

Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by

pepper-ball rounds fired by law enforcement personnel. One round cut Chang's arm. The other

shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event

as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice.

I'm very sure he pointed at me*."*



*Hyoung Chang's arm after being shot.*

83.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP. While at the protest, Mr. Thorn served at times as a medic. Mr. Thorn is a veteran who served in the Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, DPD officers targeted him and shot pepper balls. He observed a largely peaceful protest. He witnessed DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately with these ordinances and without regard for safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was struck that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When

Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time.

84.     On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball.

85.     On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol. When she was shot in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance.



*Megan Matthews after being shot in the eye.*

86.     On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7, was struck four times by KIPs fired by DPD officers in the chest. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level.



*What the camera looked like after being shot.*

87.     On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round while standing beside a professional cameraman from that station. The round struck Mr. Jojola's backpack.

88.     On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer was standing in a group of press photographers when a law enforcement officer kicked a pepper gas canister directly into her face.



*Lindsay Fendt after having a tear gas canister kicked into her face.*

89.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with KIPs without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a medic to attend to those injured by the police. At one point, the Police excessive tear-gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it was a cloud

that could not be seen through. Mr. McDaniel saw a protester crawling out on his hands and knees. The protester was choking and could not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with KIPs. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause any injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls.

90.     On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a KIP without warning. Prior to the curfew, DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face. A federal jury awarded $1,000,000 to Ms. Epps after a three-week trial with $250,000 of the verdict awarded because a jury determined that a DPD officer used force against her in retaliation for her free speech activity maliciously and/or in reckless disregard of her federally protected rights.



*Elizabeth Epps after being shot in the face.*

91.     On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a KIP without warning. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the back of a DPD truck fired a projectile at his face without warning and blinded him in one eye. Mr. Feldmann, a 21-year-old delivery driver with Denver's River Bear American Meats, was walking about 9:30 p.m. from his friend's apartment at Grant Street and Colfax Avenue to his car parked a block away on Sherman Street. It was the first night that Denver was under an 8 p.m. curfew due to ongoing protests of police brutality, but Feldmann was trying to get home. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. Mr. Feldmann didn't see what hit him, but that reached his hand up to his face and felt blood. His

friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. The surgeon who operated on Feldmann's eye told Mr. Feldmann's mother that the damage was consistent with a rubber bullet.



*Jax Feldmann after being shot in the eye.*

92.     On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a KIP without warning. Mr. Murphy's son was peacefully protesting in downtown Denver. After being shot, he was taken to the emergency room.



*Mr. Murphy's son after being shot in the eye.*

93.     On May 30, 2020, DPD officers without warning shot Russell Strong in the head with a KIP. Mr. Strong was protesting near Civic Center Park and carrying a sign that read "No justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a KIP. The force of the KIP knocked him out. As a result of this use of force, Mr. Strong required several facial reconstructive surgeries to repair broken bones around his eye and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot,

Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction.

94.     On Saturday, May 30, 2020, DPD officers without warning sprayed Stanford Smith in the face with pepper-spray for no identifiable reason other than he was exercising his free speech rights. Mr. Smith arrived at the protests near the Capitol at about 4 p.m. He was there to stand in solidarity with those who were demonstrating against police violence and to exercise his own First Amendment right to protest. When he arrived, he joined a large crowd of protesters chanting, "I can't breathe" and "Don't shoot!" Most protesters had their hands in the air. Mr. Stanford did not see anyone throw anything at officers. About five minutes after Mr. Smith arrived, officers dressed in riot gear standing near a Denver Police Department surveillance truck shot cannisters of tear gas into the crowd. Officers did not offer a warning before firing the tear gas. Because of the effect of the tear gas, Mr. Smith left the immediate area. At about 7 p.m., Mr. Smith was standing with a group of protesters near Civic Center Park. Mr. Smith became fearful as officers formed a single file line and encircled the area, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, Mr. Smith began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. One Black officer thanked Mr. Smith for trying to keep the peace. As Mr. Smith was talking to protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed Mr. Smith directly in his face with pepper spray. The officer did not give any warning before spraying the pepper spray in his face. Mr. Smith feared for his life: he could not see, and he felt as though his face was on fire. He tried

to run for safety, and protesters grabbed him by the arms and led him to the grass. They poured milk in his eyes and on his face. Mr. Smith felt severe pain. His vision remained blurry, and he tripped on the curb on the way home. A bystander called paramedics, who poured solution on Mr. Smith's face to help with the burning. At first, Mr. Smith was fearful of the paramedics because he thought they were the police. He collapsed on the floor when he finally got home and needed his roommate to pour more water on his face. His face remained red for several days, and his skin eventually peeled. Mr. Smith took his claims for excessive force and violation of his free speech rights to trial against Denver, and a jury found that Denver violated his rights and awarded him $1,000,000.



*Mr. Smith immediately after being pepper-sprayed in the face.*

95.    On May 31, 2020, Gabe Schlough was shot in the face with a KIP by DPD officers without warning. Mr. Slough, an individual with a degree in public health anthropology who some had medical training and had participated in protests before, attended the protests near the state Capitol with the intention of being there help anyone who was injured by the DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down

a line of police. They were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with KIPs. Mr. Slough described the sensation as getting his with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The KIP had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required 22 stitches to close the wound on his chin. He still experiences pain from this wound and will likely require plastic surgery for it to heal properly.



*Gabriel Schlough's chin after being shot.*

96.     On May 31, 2020, DPD officers used excessive force against Robert Dayton. Mr.

after seeing the George Floyd protests in Denver covered on the news and hearing explosions

from his apartment. Mr. Dayton went to observe the protests in the evening. Mr. Dayton wished

to get an unbiased, firsthand look at the way police were responding to the protesters. When Mr.

Dayton arrived at the protests, which were happening on Colfax Avenue, he saw that DPD

officers were aggressively advancing on the protesters and indiscriminately shooting at them

with Kinetic Impact Projectiles ("KIPs"), including 40mm rounds and pepper balls. Mr. Dayton

did not observe the protesters engaging in any unlawful behavior. There was no property

destruction or aggression against the police by protesters. Mr. Dayton was shocked to see DPD

officers using force against peaceful protesters, so he decided to join the protesters to express his

belief that this violent reaction by the police was wrong. After Mr. Dayton joined the crowd of

protesters, DPD officers continued to indiscriminately shoot pepper balls and other KIPs into the

crowd. Mr. Dayton was hit multiple times by pepper balls shot by DPD officers near the

intersection of Colfax Avenue and Emerson Street. When Mr. Dayton was shot with pepper

balls, he was not engaging in any property destruction, committing any crime, threatening any

law enforcement officer (or anyone else), or attempting to flee arrest. When Mr. Dayton was shot

with pepper balls he was peacefully protesting. Prior to being shot with pepper balls, DPD

officers never issued a warning of any kind that pepper balls would be deployed or that Mr.

Dayton, specifically, should cease engaging in any conduct or risk being shot with pepper balls.

Mr. Dayton was given no warning whatsoever prior to being pelted with pepper balls. Even after

being shot with pepper balls, Mr. Dayton sat down in pain to demonstrate that he was not being

aggressive in any way towards the DPD officers in front of him or the community surrounding

him even as the officers continued their aggression toward Mr. Dayton and his fellow protesters.
Mr. Dayton was sitting in the middle of a crowd of peaceful protesters near the intersection of
Colfax Avenue and Emerson Street. As Mr. Dayton was sitting down, DPD officers again began
advancing on the crowd. The DPD officers began, again, deploying KIPs indiscriminately into
the crowd. There was no announcement or warning prior to the deployment of the KIPs. Mr.
Dayton noticed that others around him were turning around to disperse from the aggressively
advancing officers. Seconds after DPD officers began advancing on the crowd of peaceful
protesters, one of the DPD officers threw a flash-bang grenade directly at Mr. Dayton, who was
still sitting in the middle of the crowd. The flash-bang grenade struck Mr. Dayton directly in his
left elbow. Immediately after hitting Mr. Dayton's elbow, the flash-bang grenade exploded,
searing Mr. Dayton's eyes and causing him significant pain in his elbow. Prior to deploying the
flash-bang grenade, the DPD officers never issued a warning that a flash-bang grenade would be
deployed. The DPD officers did not allow Mr. Dayton time to retreat from the deployment of the
grenade nor did they instruct him on where he needed to go to avoid being subject to the
grenade. When Mr. Dayton was hit with the flash-bang grenade, he was not engaging in any
property destruction, committing any crime, threatening any law enforcement officer (or anyone
else), or attempting to flee arrest. When Mr. Dayton was hit with the flash-bang grenade, he was
peacefully protesting. Because of Defendants' actions, Mr. Dayton suffered numerous damages.
He endured enormous pain in his elbow. For a while, Mr. Dayton was limited in his ability to
work and needed to work odd intermittent hours to keep up with his full-time job due to his
difficulty typing with his left arm. For a while, Mr. Dayton was also unable to work his side
business of electronics assembly as a result of his injuries and eventually closed it the next year.
There was no basis to shoot Mr. Dayton with KIPs or to throw a flash-bang grenade directly at

him. He, like countless others who were shot with projectiles and seriously injured during the George Floyd protests, was simply peacefully protesting police brutality when he was shot and grenaded.



*Mr. Dayton's elbow after being hit with the flash-bang.*

97.    On May 31, 2020, Zachary Packard was shot in the head with a KIP by DPD officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. Mr. Packard heard a message from a SWAT vehicle that "curfew was in effect." DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit in the head with a projectile. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and

jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week. A jury found that Denver violated Mr. Packard's First and Fourth Amendment rights, and awarded Mr. Packard $3,500,000 after a three-week trial.



*Zachary Packard after being shot in the head*

98.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with KIPs without warning. Well before curfew, Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD officers shot them approximately 14 times.

The DPD officers did not give any orders before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree.

99.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by law enforcement and shot in the head and abdomen with KIPs. DPD officers fired at Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right abdomen.



*Alex Burness after being shot in the abdomen*

100.   On May 31, 2020, DPD officers shot Darian Tindall in the chest with KIPs without warning. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD.

101.   On May 31, 2020, DPD officers shot at Trevor Hughes face with KIPs without warning. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at approximately 8:30pm. While recording, with the camera near his face, DPD officers shot Mr. Hughes in the hand with a KIP. The shot broke and severed Mr. Hughes's right ring finger, leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes had to have his finger surgically repaired.

102.   On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning. As a photographer and freelance journalist, Mr. Cruz wanted to document the protests as well as the police response. Throughout the evening, he documented the protests and police action as a photojournalist. At about 8:00 p.m., he was with protesters in front of the Capitol. The protesters were chanting and peaceful. There were over 100 people present. There was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and foam bullets at the protesters. They did not give any warning or orders. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas. At approximately 13th Avenue, he saw a man in an electric wheelchair. The man was stuck and Cruz tried to give him a hand. However, the wheelchair was extremely heavy. Unfortunately, Cruz had to leave him there while he was being engulfed by tear gas. Mr. Cruz ran towards the

library. Around 13th Avenue, the DPD officers were shooting at him and protesters with tear gas and pepper balls. There were a lot of people who were trying to leave to go home. There were approximately 35 people at that corner, and they were all younger protesters, including teenagers. Almost all of them were Black. One protestor was having a seizure. Mr. Cruz and others tried to help him. Some people tried to leave, but DPD officers cornered them and shot pepper balls at them. A white person went up to the DPD officers to ask if they could leave because people wanted to go home. The DPD officer said that they could go home, and so people started walking towards where the officer told them to go. That officer started firing on people and everyone started running. Mr. Cruz ran with other protesters to a building and garage at 13th Avenue and Lincoln. The DPD officers tan after them. The DPD officers were shooting them with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran down to the garage but discovered that armored vehicles blocked off both ends of the block and there was no exit. Cruz ran up the stairs, and as he looked up, a Defendant DPD Officer shot him in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and other problems with his eyesight.

103.     DPD officers violated the First and Fourth Amendment rights of Amanda Blasingame and Maya Rothstein on multiple occasions during the George Floyd protests. At about 8 p.m. on May 28, 2020, Ms. Blasingame and Ms. Rothlein were gathered in a crowd of protesters outside of a police station near the Capitol. They were there to exercise their First Amendment right to protest and to stand in solidarity with those demonstrating against police violence. Though they witnessed some protesters throw things at the building, they did not observe any protesters throw anything at officers. As police marched from the station parking lot into the street, they released tear gas and shot rubber bullets into the crowd. Officers did not issue any warnings prior to using these tactics. Later that night, at about 9:30 p.m., a large group was chanting in the street. After one individual threw a single plastic water bottle toward the police, officers tear gassed the entire crowd and continued using tear gas to move the group up the street. On May 30, 2020 at about 5:30 p.m., Ms. Blasingame was gathered in a large crowd outside of the Colorado State Capitol building. Ms. Blasingame, along with the rest of the crowd, was on her knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and pepper bullets at the crowd without giving any warning.  Ms. Blasingame returned home to comply with the 8 p.m. curfew. She and Ms. Rothlein gathered in their front yard with some neighbors. When a police car followed by a line of SWAT vehicles drove down their street, one neighbor yelled at the police car. The police car and the SWAT vehicles stopped and the officers exited their vehicles. While the officers in SWAT gear stood in the street holding weapons, one officer came up to Ms. Blasingame and Ms. Rothlein's fence and began threatening to pepper spray them while they sat on the steps of their own home. While holding the pepper spray up and pointing it at them, the officer stared directly at Ms. Rothlein, who was the only Black person in the front yard. Only after Ms. Blasingame

reminded the officer of their First Amendment rights did the officer leave. Later that night, a SWAT vehicle drove down the street in front of Ms. Blasingame and Ms. Rothlein's home. Someone again shouted at the SWAT vehicle to leave their neighborhood. From the SWAT vehicle, officers shot pepper bullets directly at Ms. Blasingame and Ms. Rothlein where they were sitting on the front steps of their apartment. Pepper bullets hit the front door and even entered the apartment building. Ms. Blasingame and Ms. Rothlein retreated to the mail room of their apartment complex out of mortal fear only to find the mail room filled with what appeared to be a gas-like substance. They could not enter the mail room for several days thereafter. Another pepper bullet hit one of Ms. Blasingame and Ms. Rothlein's neighbors, who was coughing and vomiting for over an hour after being hit. Ms. Blasingame and Ms. Rothlein sued Denver for a violation of their Constitutional rights and eventually went to trial on their claims. A federal jury found that Denver violated Ms. Blasingame's and Ms. Rothlein's First and Fourth Amendment rights and awarded them $1,000,000 each.

104.    DPD officers violated the First and Fourth Amendment rights of Ashlee Wedgeworth on multiple occasions during the George Floyd protests. Ms. Wedgeworth participated peacefully in protests in Denver every day from May 28, 2020 through June 4, 2020, and witnessed Officers in Denver exerting excessive force on several days she attended. She attended protests to stand in solidarity with those demonstrating against police violence and to exercise her own First Amendment rights. On the evening of May 29, 2020, Ms. Wedgeworth and a friend arrived near the Colorado state Capitol building to participate in the protest. Ms. Wedgeworth observed some individuals, who were standing far away from Ms. Wedgeworth, throw something in the direction of officers. In response, officers began shooting projectiles at those individuals, but then also turned and shot at Ms. Wedgeworth and her friend with pepper

balls. The pepper balls hit Ms. Wedgeworth's friend, and the resulting dust rendered Ms. Wedgeworth unable to breathe. Ms. Wedgeworth and her friend were not standing anywhere near the individuals who had thrown the objects. Officers did not offer a warning prior to shooting. On May 31, 2020, Ms. Wedgeworth experienced tear gas at night, when she was marching with a crowd of protesters on the streets surrounding the Capitol. The protesters were chanting and marching. Some protesters at the front of the march were laying down in the street, like George Floyd, but none were throwing items or being violent. Officers did not issue a warning before releasing the tear gas. Due to the tear gas, Ms. Wedgeworth's face, eyes, nose, and mouth felt like they were burning; she could not see; and she was coughing a lot. On the evening of June 1, 2020, when Ms. Wedgeworth was protesting at the Capitol, officers formed a line in front of the Capitol and began pushing crowds into the street. Ms. Wedgeworth felt as though officers were trying to corral all of the protesters into one area. Then, once the protesters were corralled, officers release tear gas without warning. Ms. Wedgeworth again could not see, she was coughing, and her face felt like it was burning. Ms. Wedgeworth attended the protests again on June 2, 2020. That night, officers again released tear gas into the crowd of protesters. Ms. Wedgeworth also witnessed officers shoot projectiles that appeared to be pepper balls at protesters. As a result of the tear gas and pepper ball dust Ms. Wedgeworth inhaled on May 29, May 31, June 1, and June 2, 2020, Ms. Wedgeworth suffered pain and difficulty breathing, as well as burning in her nose, eyes, and on her face for a few hours after being gassed. Ms. Wedgeworth sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Wedgeworth's First and Fourth Amendment rights, and awarded her $750,000.

105.     DPD officers violated the First and Fourth Amendment rights of Hollis Lyman on multiple occasions during the George Floyd protests. On May 28, 2020, at about 8:30 p.m., Ms. Lyman arrived at the area of the State Capitol to exercise her First Amendment right to protest and to stand in solidarity with those demonstrating against police violence. She joined a crowd of protestors by the Capitol but was quickly pushed down a street near the Capitol by Officers. Officers tear gassed the entire crowd and Ms. Lyman felt like the tear gas was everywhere around her. Her eyes watered, and she coughed and gagged several times. Ms. Lyman did not hear officers issue a warning before releasing the tear gas. On May 29, 2020, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" Ms. Lyman observed police cars drive through the group and release tear gas and pepper balls from the vehicles. Ms. Lyman's eyes began to burn, and she ran away from the group to rinse her eyes with milk. Later, after returning to the protest, she used her sign as a shield to protect her from pepper balls. One pepper ball pierced through the sign, hitting Ms. Lyman and bruising her arm. On March 30, 2020, Ms. Lyman heard protest organizers encouraging peaceful protests. At about 3:30 p.m., Ms. Lyman observed officers shooting pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, officers shot more pepper balls as well as grenades at protesters. One grenade hit Ms. Lyman's friend in the leg and made a deafeningly loud sound. Ms. Lyman became disoriented from the sound. Ms. Lyman and her friend had difficulty hearing for the rest of the night. Ms. Lyman also observed officers pull a boy's goggles and mask off of his face before spraying him in the face with pepper spray. Because Ms. Lyman desired to protect the people of color who were attempting to protest, Ms. Lyman returned to the protest area on Saturday night, at times placing herself between the police and people of color who were protesting. As Ms. Lyman and a friend were walking toward a group of protestors at

the Capitol that night, Officers in Denver routed them through a particular street. Ms. Lyman and her friend complied with the directions, but Officers shot Ms. Lyman in the back repeatedly with pepper balls anyway, as she tried to protect her friend. She struggled with gagging and nausea after inhaling gas and, after she returned home that night, Ms. Lyman threw up. Ms. Lyman sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Lyamn's First and Fourth Amendment rights and awarded her $1,000,000.

106.    DPD officers violated the First and Fourth Amendment rights of Kelsey Taylor on multiple occasions during the George Floyd protests. On May 28, 2020, Ms. Taylor marched with protestors in the downtown area and north towards I-25. After the protestors got off the highway, protestors headed back towards the Capitol. There were over one hundred people. Around Platte and the pedestrian bridge near Confluence Park, protestors stood there. Ms. Taylor heard one DPD officer say something to the effect of, "If anyone moves, light 'em up." DPD officers began shooting pepper balls at the protestors without warning or any orders. Many people were injured. Ms. Taylor marched back to the Capitol with other protestors. At 14th Avenue and Sherman, there was a line of DPD officers on 14th Avenue. Ms. Taylor and the other protestors stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protestors walked down 14th Avenue and joined Ms. Taylor's group of protestors. There were approximately two hundred people. At some point, the DPD officers tear gassed the entire crowd, without provocation. Ms. Taylor did not see anyone throw anything or get aggressive with the police. DPD officers gave no warning or orders. Ms. Taylor inhaled tear gas, which caused breathing and vision problems. On May 30, 2020, Ms. Taylor went to the Capitol at around 5:00 or 6:00 p.m. to protest. She stood with other peaceful protestors on 14th

Avenue in front of the Capitol building. Any time there was the slightest agitation in the crowd, even if it was non-violent, the DPD officers started shooting pepper balls and throwing tear gas without giving any warnings or orders. The DPD officers also shot into the crowd whenever protestors walked forward closer to Colfax. Ms. Taylor was hit by pepper balls, which caused bruises. She also inhaled tear gas. After curfew, at 14th Avenue and Broadway by the public library, Ms. Taylor was with approximately one hundred other demonstrators protesting the curfew itself. Ms. Taylor and the other demonstrators knelt in the intersection of 14th Avenue and Broadway. The DPD officers formed a line. They were in full riot gear and had batons and/or truncheons. They advanced towards the protestors. Ms. Taylor and the others remained kneeling. They began jabbing people, including Ms. Taylor, with batons. Ms. Taylor saw a DPD officer hit a Black man across his chest with his baton. Ms. Taylor said words to the effect of, "You can't do that, he's not hurting you, he's unarmed." Another DPD officer grabbed Ms. Taylor's arm and told her that she was under arrest. Ms. Taylor heard another officer say, "Get me three more." Ms. Taylor sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Taylor's First and Fourth Amendment rights and awarded her $1,000,000.

107.    DPD officers violated the First and Fourth Amendment rights of Sara Fitouri and Jacquelyn Parkins on multiple occasions during the George Floyd protests. On or around 5:00 p.m. on May 28, 2020, Ms. Parkins went to the Capitol building and participated in the protests. When some of the protestors began marching north, Ms. Fitouri joined Ms. Parkins as Ms. Parkins marched with them. The protest was peaceful. Ms. Fitouri and Ms. Parkins marched through Confluence Park toward I-25 with the rest of the marchers. On or around 7:00 p.m., they observed the DPD officers fire dozens of pepper balls on the group of protestors on the highway.

At that time, Ms. Fitouri and Ms. Parkins were on a pedestrian walkway over I-25. They inhaled pepper spray from the pepper balls while on the walkway. When they rejoined the march heading back downtown, they inhaled tear gas and/or pepper spray that DPD officers had used on protestors in that area. On or around 1:00 p.m. on May 29, 2020, Ms. Fitouri and Ms. Parkins arrived at or near the Capitol to join the protest and march. They marched with the other protestors, who were peaceful. The march went to several locations, including the City and County Building and the jail. At approximately 8:00 p.m., Ms. Fitouri and Ms. Parkins and other protestors were at the intersection of Colfax and Broadway. The group was peaceful. Someone in the group may have lofted a water bottle into the air. Rather than investigate and isolate that person, DPD officers indiscriminately opened fire with tear gas and pepper balls at the entire group of protestors, including Ms. Fitouri and Ms. Parkins, without warning or order to disperse. Once the initial pepper spray rounds were fired, the DPD officers continued to use pepper balls, tear gas, and flash-bang grenades on the protestors, including Ms. Fitouri and Ms. Parkins, from the corner of Broadway and Colfax, as well as multiple other locations on and around the Capitol. At one point, the DPD officers used pepper balls, tear gas, and flash-bang grenades to push protestors southeast of the Capitol into the surrounding neighborhoods. Ms. Fitouri and Ms. Parkins, along with another group of protestors, inhaled significant amounts of pepper spray and tear gas during this offensive move. Ms. Fitouri and Ms. Parkins saw many injured protestors at this time, including one woman who was unable to see or breathe and was caught in the gas. The DPD officers did not close any of the streets and their actions pushed protestors into active oncoming traffic. Ms. Fitouri and Ms. Parkins left the protest on or around 10:30 p.m., after experiencing significant exposure to tear gas fired by DPD officers very close to their persons. DPD officers used pepper balls, teargas, and flash-bang grenades on protestors consistently

throughout the evening and were still using pepper balls, tear gas, and flash-bang grenades at the time Ms. Fitouri and Ms. Parkins left. The DPD officers used pepper balls, tear gas, and flash-bang grenades across Colfax Avenue while the street was filled with traffic waiting at the red light. Many cars had pepper balls, tear gas, and flash-bang grenades hit their cars or the ground immediately next to the cars. On the evening of May 29, 2020, Ms. Fitouri and Ms. Parkins also observed that DPD officers indiscriminately shot tear gas and/or pepper balls at the entire group of protestors anytime protestors moved within approximately fifteen feet of the Officers. DPD officers never gave any warnings or dispersal orders before shooting tear gas and/or pepper balls at protestors. DPD officers shot tear gas and/or pepper balls at peaceful protestors who were kneeling on many occasions. Many of these protestors had their hands in the air and their shirts off. At many points in the evening of May 29, 2020, when Ms. Fitouri and Ms. Parkins and other peaceful protestors were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," DPD officers fired flash-bang grenades, tear gas, and pepper balls into the crowd indiscriminately and without warning or orders. On the evening of May 30, 2020, Ms. Parkins saw DPD officers hanging off the sides of police trucks and shooting at protestors as fast as they could. On or around 4:00 p.m., Ms. Fitouri and Ms. Parkins arrived at the Capitol building for the evening protests prior to the start of curfew. They began at the west steps of the Capitol building. Before curfew that day, a DPD officer on Colfax north of the protestors threw a flash-bang grenade into the crowd, which exploded at Ms. Fitouri's foot. Ms. Fitouri's foot went numb and she suffered minor burns. The DPD officers had also shot tear gas, flash-bang grenades, and/or pepper spray into the crowd of protestors without warning or dispersal orders. A friend of Ms. Fitouri's and Ms. Parkins's was very badly gassed. There was no warning about enforcement of the curfew before the curfew. Instead, at 8:00 p.m., DPD officers came out of the

Capitol building and launched tear gas, flash-bang grenades, and/or pepper spray at the protestors, including Ms. Fitouri and Ms. Parkins, indiscriminately and without warning or dispersal orders. Ms. Fitouri and Ms. Parkins then marched with a group of protestors. Southeast of the Capitol, DPD officers began shooting pepper balls at the protestors without warning or giving any dispersal or other orders. Ms. Fitouri and Ms. Parkins were with a group of approximately 30 people who ran into an alley in order to avoid being hit. DPD officers chased the protestors both on foot and on SWAT vehicles into the alley in order to trap them and continue shooting at them. Ms. Fitouri was hit with pepper balls. Eventually, Ms. Fitouri and Ms. Parkins were able to get to their cars to leave. At the time that Ms. Fitouri and Ms. Parkins were present in public places in Denver after curfew on May 30, 2020, the DPD officers "enforced" the curfew against them and other protestors by shooting pepper balls or throwing tear gas at them and/or chasing them into alleys in order to use "less-lethal" weapons on them. The DPD officers did not give any warnings or dispersal orders and appeared only interested in intimidating and punishing protestors with their "less-lethal" weapons. Ms. Fitouri and Ms. Parkins saw many non-protestors present in public places in Denver after curfew on May 30, 2020 who were ignored by the DPD officers and were not shot at, tear gassed, pepper sprayed, or arrested. After they left the protest, Ms. Fitouri and Ms. Parkins returned to their place of work at 15th Avenue and Grant Street where their cars were parked, in order to go home. They were standing in a private parking lot of their workplace. A group of protestors came by. Suddenly, one or more police vehicles screeched to a halt, many DPD officers got out of their vehicles and began shooting pepper balls and/or tear gas at the protestors without warning or dispersal orders. Ms. Fitouri and Ms. Parkins attempted to hide behind their own vehicles. The DPD officers shot at them and other protestors running through the parking lot from approximately 20 feet away.

On May 31, 2020, in the early evening, Ms. Fitouri and Ms. Parkins met at the Capitol to join the protest, which was peaceful. They marched with the other protestors. After the 8:00 p.m. curfew, when Ms. Fitouri and Ms. Parkins and the protestors marched by the police precinct on Washington and Colfax, DPD officers intentionally allowed half the group to pass and then began tear gassing, flash-banging, and pepper spraying the middle of the protest march. There were likely several thousand protestors in the march at this time. One of their friends was hit three times with tear gas canisters, once in his head, once in his back, and once in his hand. He was seriously injured and immediately left to seek treatment at a nearby hospital. At one point on that evening, Ms. Fitouri and Ms. Parkins were near the Basilica at 15th Avenue and Grant Street with at least one hundred other protestors. DPD officers kettled the protestors. Indiscriminately and without warning or orders, DPD officers shot tear gas, flash-bang grenades, and pepper balls into the crowd from every direction. It was difficult for protestors to escape. On days when they attended protests in Denver and during the events described above, Ms. Fitouri and Ms. Parkins experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. Ms. Fitouri and Ms. Taylor sued Denver for its violation of their constitutional rights. After a three-week trial, a federal jury found that Denver violated their First and Fourth Amendment rights and awarded them $1,000,000 each.

108.     Denver has not disciplined any officers for the above-outlined incidents. They have provided no additional training to officers who used the above-outlined force against peaceful protesters. This is indicative of Denver's customs, policies, practices, and training that condones the above-described force by its officers against peaceful protesters.

**DPD officers customarily used indiscriminate force against protesters, and those assumed to be protesters, without warning.**

**May 28, 2020**

109.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 28, 2020.

110.     DPD officers also brutalized a group of protesters gathered near the intersection of 14th Avenue and Sherman Avenue. Protesters at this intersection encountered a line of DPD officers and stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protesters walked down 14th Avenue and joined this group of protesters. There were approximately 200 people. The officers tear gassed the entire crowd, without provocation or warning.

111.     DPD officers also brutalized an entire group of protesters near the Capitol building at about 6:30 p.m. At that time, DPD officers started launching tear gas canisters into a crowd of protesters without warning. At least one young man was hit with a canister. As soon as DPD officers launched the tear gas, the officers hopped on the back of a patrol van and drove away. Around 8 p.m., DPD officers returned to the Capitol building and formed a line. They slowly began advancing toward the protesters at the Capitol building. Without provocation or warning, the DPD officers launched tear gas at the crowd. At about 8:30 p.m., a crowd of protesters that was pushed down a street near the Capitol by DPD officers was tear gassed without any warning. At about 9 p.m., the crowd at that time was mostly seated on the Capitol steps talking amongst themselves. Then, without any warning or order to disperse, DPD officers deployed tear gas toward, and into, the crowd.

112.     Later that same night, DPD officers indiscriminately shot peaceful protesters with KIPs, including pepper balls and foam bullets.

**May 29, 2020**

113. DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 29, 2020. In the evening, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" DPD police cars drive through the group and released tear gas and shot KIPs from the vehicles at peaceful protesters.

114. Around approximately 4 p.m., DPD officers began firing KIPs, including rubber bullets and pepper balls, into the crowd of peaceful protesters every few minutes. They also threw flash bang grenades indiscriminately into the crowd every couple of minutes, which made deafening sounds. Protesters were not throwing any objects at officers or otherwise provoking the police violence that was visited upon them. After about an hour, DPD officers formed a riot line and crossed the street towards the protesters, shooting more pepper balls and rubber bullets. When this did not disperse the crowd, DPD officers released tear gas.

115. There was no warning about enforcement of the curfew (which was newly implemented (which was newly implemented) before the curfew began. Instead, at 8:00 p.m., DPD officers came out of the Capitol building and launched tear gas, flash bang grenades, and/or pepper spray at the protesters indiscriminately and without warning or dispersal orders

116. Around 8 p.m., DPD officers also shot projectiles directly at the cellphone of one protester who was using it to record and broadcast police violence to her thousands of social media followers, shattering it. Shortly after police shot this protester's phone, they deployed tear gas into the group of protesters without any warning or justification.

117. At approximately 9 p.m., DPD officers set up a line of about ten canisters of tear gas in front of the Capitol building and set them off. DPD officers did not issue a warning before any of these weapons were used.

118.   Throughout the evening, DPD officers indiscriminately shot tear gas and KIPs at the entire group of protesters anytime any single protester moved within approximately 15 feet of the officers. DPD officers never gave any dispersal orders or warning before indiscriminately shooting protesters with KIPs or tear gas throughout the evening.

119.   Officers shot tear gas and KIPs at peaceful protesters who were kneeling on many occasions. Many of these protesters had their hands in the air and their shirts off. At many points, when peaceful protesters were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," DPD officers fired flash bang grenades, tear gas, and KIPs into the crowd indiscriminately and without warning.

**May 30, 2020**

120.   DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 30, 2020. In the afternoon, DPD officers sprayed tear gas over a large area by the Capitol occupied by predominantly peaceful protesters, including children. In response to a solitary protester tossing a water bottle toward the police, DPD officers deployed tear gas without first issuing a warning. At about 3:30 p.m., DPD officer shot pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, DPD officers shot more pepper balls as well as flash bang grenades at protesters. Other DPD officers pulled a boy's goggles and mask off of his face before spraying him in the face with pepper spray. At 4 p.m., the crowd attempted to march north toward a line of officers at the Civic Center transit station, and, in response, DPD officers deployed tear gas into the crowd without warning, sending them running for their lives. At the same time, DPD officers dressed in riot gear standing near a DPD surveillance truck shot canisters of tear gas into the crowd. DPD officers did not offer a warning

before firing the tear gas. No protester was being violent in any way, or threatening property destruction.

121.    Later, at about 5:30 p.m., there was a large crowd gathered outside of the Capitol building. A number of the peaceful protesters were on their knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and KIPs at the crowd without giving any warning. Shortly thereafter, officers shot protesters with KIPs, including rubber bullets, again.

122.    At about 7 p.m., officers formed a single file line and encircled Civic Center Park, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, one protester began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. As that protester was talking to other protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed that protester directly in his face with pepper spray. The DPD officer did not give any warning before spraying the pepper spray in his face.

123.    At about 7:50 p.m., ten minutes before the 8 p.m. curfew that Denver had instituted for the first time that day, numerous protesters attempted to leave the Capitol area to head to their cars, but DPD officers had barricaded the exits, trapping them. Approximately five minutes later, while the peaceful protesters were still trapped and before the curfew began, officers sprayed tear gas into the crowd, again without warning or an order to disperse.

124.    At approximately 9 p.m., DPD officers started pushing protesters out of the Capitol building area. Officers began using teargas and shooting projectiles indiscriminately at

the crowd, including at women and children. There was no provocation or threatening behavior by the crowd, and no warnings from the officers before they shot the projectiles. Later into curfew, DPD officers continued to use indiscriminate force without warning. This included pepper-spraying individuals who were standing on their own property and shooting individuals with KIPs who yelled, from their front porches, for the officers to leave the neighborhood.

125.    Throughout the night, after curfew, there were roving gangs of DPD officers in riot gear, hanging off of vans and pickups trucks, driving around shooting protesters with KIPs. These officers were randomly, and indiscriminately, drive-by shooting citizens who were outside in the areas near the Capitol, in the Capitol Hill neighborhood, and on and around Broadway. There were no warnings given before these DPD officers shot KIPs and tear gas canisters at protesters and bystanders alike.

**May 31, 2020**

126.    DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 31, 2020. In the evening, while peaceful protesters were chanting and marching on the streets surrounding the Capitol, and some protesters at the front of the march were lying down in the street like George Floyd (but none were throwing items or being violent), DPD officers gassed the protesters without warning. Later, at about 9:30 p.m., a group of approximately 250 peaceful protesters were marching near the Capitol. Without warning, four SWAT cars pulled in on both sides of the marching crowd, "kettling" them between two side streets. The DPD officers in the SWAT vehicles released tear gas from both directions without warning. Most protesters remained trapped in the cloud of gas.

127.    After curfew, DPD officers consistently trapped peaceful protesters in corners or between lines of officers, so that they could pelt them indiscriminately with KIPs.

**June 1, 2020**

128.     DPD officers used indiscriminate and excessive force against protesters gathered at the Colorado state Capitol building on June 1, 2020. Throughout the day and into the night, the protest was completely peaceful. At about 8:00 p.m., there were approximately 100 peaceful protesters in front of the Capitol. DPD officers formed a line in front of the Capitol and began pushing the peaceful crowd into the street and other officers surrounded the peaceful protesters on all sides. Once the protesters were successfully kettled, DPD officers released tear gas without warning. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape.

129.     Around midnight, dozens of DPD officers came out of the shadows at the Capitol building, and a group of protesters began chanting, "Why are you in riot gear, I don't see no riot here." Protesters lay down in the street with other people linking arms. There were also protesters demonstrating against the police in a line. DPD officers began marching onto the lawn. Without any warning or dispersal order or any words, the DPD officers began tear-gassing the demonstrators. DPD officers also used a noise cannon without warning.

130.     As a result, a number of individuals who were attending the protests as medics left the protest. The group of medics that fled encountered approximately 50 DPD officers at the intersection of Lincoln and Broadway. DPD officers surrounded the medics, pushed them into a corner and began dousing them with pepper spray. The medics in front were wearing gear clearly identifying them as medics.

**June 2, 2020**

131.     DPD officers used indiscriminate and excessive force against protesters gathered on June 2, 2020. That night, DPD officers again released tear gas into the crowd of protesters

without warning and shot KIPs, including pepper balls, at protesters. DPD officers utilized the same tactics they had used the previous five nights.

**Defendant Pazen and Mayor Michael Hancock ratified DPD officers' use of grossly excessive force and violation of protesters free speech rights.**

132. On the morning of May 29, 2020, Defendants Pazen and Mayor Michael Hancock held a press conference. During that press conference, Defendants Pazen and Mayor Hancock praised and explicitly condoned DPD officers' actions during the first two days of the George Floyd protests. Defendants Pazen and Mayor Hancock stated, at least a half dozen times, during the press conference that their observations were that the DPD officers had used "restraint" during their response to the first two days of the protests, despite there being large amounts of evidence that DPD officers had systematically used excessive force against protesters. Such official statements from the Mayor and the Chief of Police confirmed that the conduct of the DPD officers as described herein were pursuant to and consistent with the City's official policies, training, customs and practices.

133. DPD officers, knowing that the Mayor of Denver and the Chief of Police had condoned their policing of the first two days of the protests (including their use of excessive force and retaliation against peaceful protesters), thereafter continued to use grossly excessive force against protesters, including Plaintiff, to retaliate against them for exercising their right to gather and protest police brutality.

134. Defendants Pazen's and Mayor Hancock's decision to condone the use of excessive force and retaliation by DPD officers sent a message to Defendants Allred, Simmons, and Havard that they were authorized to use excessive force and retaliate against Plaintiff. Defendant Pazen's and Mayor Hancock's actions, and Denver's actions, caused the violation of Plaintiff's Constitutional rights.

**Federal Judge R. Brooke Jackson holds that Denver's actions violated the Constitution.**

135.    On Thursday, June 4, 2020, four persons who participated in the Denver protests since they began sued Denver, alleging that DPD officers' use of "less-lethal" weapons violated the First and Fourth Amendments. After a hearing on the matter, United States District Court Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order restricting DPD and jurisdictions invited by DPD from using "less-lethal" projectiles and chemical agents on peaceful protesters. *See Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020).

136.    In doing so, Judge Jackson noted that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, Judge Jackson was unequivocal about the behavior of DPD officers toward protesters, calling it "disgusting."

137.    Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc.… solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protesters." Judge Jackson found it particularly problematic that "officers specifically aimed at heads and groins, causing broken facial bones and ruptured testicles." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

138.     Judge Jackson also held that there was a "strong likelihood" that DPD officers had violated the First Amendment in their treatment of peaceful protesters. In doing so, he found that: (1) the protesters "were engaged in constitutionally protected activity through organized political protest"; (2) DPD officers' "use of excessive force likely caused injury sufficient to chill a person of ordinary firmness from continuing to engage in that political protest" because "[o]fficers used physical weapons and chemical agents to prevent not just peaceful demonstration, but also the media's ability to document the demonstrations and plaintiffs' and third parties' ability to offer aid to demonstrators" resulted in "[p]eaceful demonstrators' legitimate and credible fear of police retaliation" that was "silencing their political speech—the very speech most highly valued under the First Amendment."

139.     Judge Jackson also made it a point to note that although he did "not agree with those who have committed property damage during the protests, property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice. If a store's windows must be broken to prevent a protestor's facial bones from being broken or eye being permanently damaged, that is more than a fair trade. If a building must be graffiti-ed to prevent the suppression of free speech, that is a fair trade. The threat to physical safety and free speech outweighs the threat to property.

140.     Ultimately, Judge Jackson issued a temporary restraining order **banning** DPD officers, and those under their command, from shooting KIPs in a way that targets the "head, pelvis, or back" and from shooting KIPs "indiscriminately into a crowd." Judge Jackson also ordered that DPD were **required** to issue an order to disperse prior to using any chemical agents and that that order had to be followed "with adequate time for the intended audience to comply" and allow for egress.

141.     The incident involving Mr. Hampton was presented to Judge Jackson at the temporary restraining order hearing and Judge Jackson's order in *Abay* was based on the actions of the officers with respect to Mr. Hampton.

**DPD Defendants Denver and Pazen abjectly failed to adequately train DPD officers prior to the George Floyd protests and supervise DPD officers during the George Floyd protests.**

142.     After the George Floyd protests, DPD Lieutenant John Coppedge was interviewed by Denver's Independent Monitor Nick Mitchell. Lieutenant Coppedge was a part of DPD's training academy. During that interview, Lieutenant Coppedge told Independent Monitor Mitchell that he saw DPD's response to the George Floyd protests as a total leadership failure. Lieutenant Coppedge told Mr. Mitchell that the officers on the ground were reacting to what they saw without any sort of leadership during the protests. Lieutenant Coppedge also revealed to Mr. Mitchell that under Defendant Pazen's administration, the prevailing attitude is that training is not important.

143.     Mr. Mitchell also spoke to DPD Sergeant Erik Knutson after the George Floyd protests. Sergeant Knutson told Mr. Mitchell that he worked hard to develop a three-day field force operations class in 2015 and that in 2015 and 2016 he trained DPD officers using that field force operations class. However, in mid-2016, DPD decided that it would no longer provide field force training because it was too time intensive. Sergeant Knutson informed Mr. Mitchell that from what he observed of the DPD response to the George Floyd protests, the tactics used by DPD were not anything that would be taught in training. This included the repeated decision by officers to not utilize their batons to move crowds of people, and instead move crowds using pepper balls; Sergeant Knutson told Mr. Mitchell that there was a significant overreliance on pepper balls during the George Floyd protests.

144.     Another officer, Jesse Trudel, spoke about the lack of training for line officers during an IA interview after the George Floyd protests. Officer Trudel said that he only received field force training in the academy, and that amounted to only between four and eight hours of training. Officer Trudel said most of the training focused on how to properly don gear and gas masks, and that they only conducted one total hour of field force training

145.     DPD Captain Sylvia Sich was also interviewed by Denver's Independent Monitor Nick Mitchell. During that interview, Captain Sich told Mr. Mitchell that she believed that a lot of the protesters were injured by DPD officers due to a lack of supervision provided to the DPD officers by command staff, including Defendant Pazen.

146.     Captain Sich told Mr. Mitchell that, during the George Floyd protests, Defendant Pazen would "lose[] it" if he was presented with an opinion different from his own on how the protests should have been handled. Captain Sich also told Mr. Mitchell that Defendant Pazen was "paralyzed" during the George Floyd protests.

**Denver's Independent Monitor, in a comprehensive report about the DPD response to the George Floyd protests, found that Denver's customs, practices, lack of training, and absence of supervision violated policing standards.**

147.     In a report titled "The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review" ("Independent Monitor Report") Denver's Independent Monitor, Nick Mitchell, outlined his findings after reviewing over two hundred hours of body-worn camera footage along with all other documentation preserved by Denver along with having access to over fifteen thousand hours of HALO camera footage. Mr. Mitchell's team also interviewed DPD officers, as outlined above, as part of the investigation. The report was released on December 8, 2020.

148.    In the Independent Monitor Report, Mr. Mitchell found, during the George Floyd protests:

a.  DPD officers routinely failed to issue dispersal orders before using force to disperse crowds. Even when DPD officers did issue dispersal orders, those orders lacked information about dispersal routes and did not warn protesters that by remaining they would be subjected to force. Often, DPD officers failed to allow enough time and space for protesters to comply even if they wanted to.

b.  DPD officers routinely were allowed to deploy pepper balls without the proper training and certification on using pepper ball launchers and the appropriate circumstances for using pepper balls.

c.  DPD lacked internal controls on the use of force that could have allowed command staff, including Defendant Pazen, to review uses of force while the events were unfolding. The lack of these controls prevented command staff from ensuring, in real time, that force was being used in conformity with DPD policies and training.

d.  DPD officers deployed pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin area.

e.  DPD officers deployed pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance.

f.  DPD officers deployed less-lethal munitions in ways that were extremely troubling.

g.  DPD officers continued to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area.

h.  DPD's policy about when it was appropriate to directly fire a pepper ball at a member of a crowd was too low, allowing officers to directly fire pepper balls at individuals who were doing nothing more than disrupting traffic during the George Floyd protests. In other words, Denver's policies relating to the use of pepper balls was directly responsible for DPD officers using pepper balls as a disproportionate use of force.

i.  DPD officers on the ground received little guidance from an on-the-ground field commander.

j.   DPD had not made enough recent investments in crowd control and field force operations training to properly prepare officers for an event like the George Floyd protests.

k.  Supervisors throughout the DPD received insufficient direction in the field and sometimes did not know who the appointed Operations Chief was on a particular day. This led to a lack of clarity among officers about their strategic objective, which led to confusion about when to advance on, retreat from, or hold specific pieces of ground in downtown Denver.

l.  DPD devoted less attention to crowd control training in the years immediately preceding the George Floyd protests, which was reflected in the volume and frequency of crowd control and field force training in the years leading up to the George Floyd protests.

149.    Ultimately, Mr. Mitchell issued a lengthy list of recommendations for policing of future protests, which were not followed during the George Floyd protests, that would have prevented the mass injuries inflicted by DPD officers and prevented the violation of the Constitutional rights of protesters. Many of these recommendations were obvious, as they were based on widely known policing standards that every police department in the nation, including DPD, is aware of.

**A federal jury found that Denver's policies, customs, practices, and training violated protesters' Constitutional rights.**

150.    In March of 2022, there was a trial in the United States District Court for the District of Colorado involving claims that DPD officers had used excessive force that violated the free speech rights of a group of eleven protesters who were shot with KIPs and subjected to flash-bangs during the George Floyd protests in Denver. The plaintiffs in the *Epps v. Denver* case claimed that Denver was liable for the violation of their rights because its officers violated their rights in accordance with the policies, customs, practices, and training of Denver.

151.    During the *Epps v. Denver* trial, Independent Monitor Mitchell testified that DPD deployed less-lethal munitions in ways that were extremely troubling. Specifically, Mr. Mitchell saw "DPD officers deploying OC spray and PepperBall rounds at persons who were only verbally objecting to police behavior, and not engaged in any apparent physical resistance" and that officers regularly deployed "PepperBall rounds and other projectiles at prohibited areas of the body, including the head, face, and groin areas."

152.    Mr. Mitchell also testified that officers continued "to deploy chemicals, gas, impact, or explosive munitions after their initial deployments had already caused people to disperse and leave an area" and that he regularly observed DPD officers throw "explosive

devices at or extremely close to individuals, sometimes resulting in people being knocked to the ground with apparent injuries."

153.    Mr. Mitchell testified that he "frequently" heard from DPD officers "that they felt a need for greater emphasis on training in crowd management and field force operations." Mr. Mitchell stated that some officers who were not certified on PepperBall and 40mm were given those weapons at the protest. Mr. Mitchell also said that DPD did not train with its mutual-aid partners and never worked with outside jurisdictions on crowd control.

154.    During the *Epps v. Denver* trial, Commander Patrick Phelan testified under oath that he had not seen any video or documentation relating to the George Floyd protests that showed DPD officers using force on protesters in a manner inconsistent with Denver's policy, training, and practice.

155.    After the three-week trial, a federal jury returned a verdict finding that DPD officers had violated each protester's First and Fourth Amendment rights. The jury also found that Denver's policies, practices, and customs caused the violation of the plaintiffs' rights. Additionally, the jury returned a verdict finding that Denver's failure to train its officers caused the violation of the plaintiffs' rights. Finally, the jury issued a finding that Denver, through Defendant Pazen, had ratified its officers' violation of plaintiffs' rights, and that ratification had caused the violation of plaintiffs' rights.

156.    After finding Denver and one DPD officer liable, the jury awarded the plaintiffs a total of $14,000,000.

**Denver condoned its officers' actions during the George Floyd protests.**

157.    The George Floyd protests spawned at least one hundred and eleven complaints that DPD officers violated the Constitutional rights of protesters and bystanders. Of the one

hundred and eleven internal affairs investigations opened by DPD as a result of the George Floyd protests, only three cases resulted in discipline for officers. Denver's widespread decision to condone the actions of DPD officers during the protests demonstrates that DPD officers' actions, including the actions of Defendants Allred, Simmons, and Havard, were consistent with the customs, policies, and practices of DPD that existed prior to, and at the time of, the George Floyd protests.

158.    Upon information and belief, Defendants Allred, Simmons, and Havard have not been disciplined for their use of force against Plaintiff in accordance with the custom and practice by Denver of condoning excessive force by its officers during the George Floyd protests.

### **According to the manufacturer standards of KIPs, including pepper balls and 40mm baton rounds, Defendants used grossly excessive against Plaintiff.**

159.    DPD officers used multiple KIPs against peaceful protesters during the protests. These KIPs included foam bullets, beanbag rounds, pepper balls, and tear gas canisters.

160.    It is extremely common for KIPs to cause contusions, abrasions, and hematomas.[12] Additionally, blunt impact may cause internal injuries.[13]

161.    Fatalities may occur when impact is at the head, neck, or precordium (the region of the chest immediately in front of the heart).[14]

---

[12] W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, The Internet Journal of Rescue and Disaster Medicine, https://print.ispub.com/api/0/ispub-article/7142.
[13] *Id.*
[14] *Id.*

162.    According to a systematic review of available literature, three percent of those injured by KIPs died from their injuries.[15] Fifteen percent of 1,984 people studied were permanently injured by them.[16]

163.    DPD officers also shot pepper balls at peaceful protesters and bystanders. Pepper balls have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.[17]

164.    In addition to the burning effect of the OC contained in the pepper balls, the balls themselves can cause serious injury—even death—because of the high velocity at which they are shot. The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second, or more than 238 miles per hour.

165.    The Boston Police Department suspended use of pepper balls in 2004 after a college student was killed when a pepper ball struck her in the eye.[18]

166.    University of California, Davis police shot a pepper ball at an unarmed student while trying to break up a block party and permanently damaged his eye in 2004.[19]

---

[15] Rohini Haar et al., *Death, injury and disability from kinetic impact projectiles in crowd control settings: a systematic review*, 2017 BMJ Open 2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017-018154.pdf.

[16] *Id.*

[17] Florida Gulf Coast University, Weapons & Equipment Research Institute, *Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis* (2008).

[18] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, Wash. Post, Oct. 24, 2004, https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5.

[19] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. Times, July 12, 2012, https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.

167.    Denver itself has been called on, and conducted an internal investigation on, whether to end the use of pepper balls after they were used in response to Occupy demonstrations in October of 2011.

168.    Since during the George Floyd protests, at least 60 protesters nationwide sustained serious injuries from the use of "less-lethal" weapons by law enforcement, including "a broken jaw, traumatic brain injuries, and blindness."[20]

169.    DPD officers' use of these less-than-lethal projectiles against peaceful protesters was approved, condoned, and ratified by Defendants Denver and Pazen. DPD officers were given specific authorization to use these less-than-lethal munitions, including KIPs, on peaceful protesters by Defendants Denver and Pazen.

**The actions of the DPD officers during the protests were ordered and condoned by Denver's final policymakers.**

170.    DPD officers were given authority by Denver's final policymakers (including Defendant Pazen) to use KIPs, including pepper balls, to shoot protesters without warning.

171.    DPD officers were given authority by Denver's final policymakers (including Defendant Pazen) to use KIPs, including pepper balls, to shoot protesters in the head, face, and chest.

172.    DPD officers were given authority by Denver's final policymakers (including Defendant Pazen) to use KIPs, including pepper balls, to shoot at completely peaceful protesters.

**DPD Officers continually violate official policy with no repercussions.**

---

[20] Kaiser Health News, *Fractured skulls, lost eyes: Police often break own rules using "rubber bullets,"* Denver Post, June 23, 2020, https://www.denverpost.com/2020/06/23/george-floyd-protests-rubber-bullet-injuries.

173.    Denver's own use of force policy restricts the use of pepper balls to only situations where there is Defensive Resistance or above. Additionally, pepper balls may only be targeted below the sternum. Unless lethal force is dictated by the circumstances, pepper balls cannot be shot at the head, eyes, throat, neck, breasts of a female, genitalia, or spinal column. And, under the policy, officers must be given clear and concise verbal commands to the targeted individual prior to, during, and after the deployment of pepper balls.

174.    DPD officers violated these policies with impunity during the protests, relegating the use of force policy to meaningless pieces of paper sitting on a dusty shelf. Upon information and belief, no officer has been disciplined for blatantly violating this policy.

175.    DPD officers violated these policies with respect to Mr. Hampton, but no officer has been disciplined. This demonstrates that Denver has an unofficial custom and practice of tolerating its officers violating the use of force policy with respect to pepper balls, and that it has a custom and practice of allowing its officers to target the head and neck with pepper balls, and fire pepper balls without providing any warning.

176.    Denver's and Chief Pazen's continued failure to discipline, supervise, and/or reprimand its officers for their repeated violation of the use of force policy effectively communicated to DPD officers that such force was consistent with Denver's customs, policies, practices, and training.

177.    DPD officers continued flagrant violation of the use of force policy demonstrates that Denver and Chief Pazen fail to train and/or supervise its officers on this policy and/or provides training and/or supervision that this policy does not need to be followed.

178.    The existence of the use of force policy demonstrates that Denver and Chief Pazen were on notice that they needed policies in place to control the use of pepper balls, but

were deliberately indifferent to the actions of DPD officers who used pepper balls in such a way as to constitute excessive force under the constitution.

**Denver's customs, policies, practices, training, and supervision caused the violation of Mr. Hampton's constitutional rights.**

179.     Additionally, DPD officers' customary and ongoing use of KIPs, including pepper balls, to target protesters for demonstrating, an improper purpose under the policy, demonstrates that Denver and Chief Pazen failed to adequately train their officers that KIPs, including pepper balls, cannot be used for the purpose of discouraging First Amendment activity, to punish those who engage in First Amendment activity, or to retaliate against those who engage in First Amendment activity.

180.     Denver final policymakers, including Chief Pazen, have received ample notice that DPD officers were using KIPs, including pepper balls, against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, condemnation from City Council members, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.

181.     Denver decision makers, including Chief Pazen, have also received notice that the actions of DPD officer in Denver against protesters violated the policies and procedures for the use of force outlined in the DPD's own Operations Manual.

182.     Moreover, Denver and Chief Pazen are responsible for the actions of any non-DPD officers whose services were utilized during the period in which protests were ongoing. By utilizing those services, Denver and Chief Pazen were required to ensure that all officers complied with both protesters' constitutional rights and Denver's use-of-force policies.

183. On May 29, 2020, after only the first day of protests, Denver final policymakers, including Chief Pazen, publicly ratified DPD officers' use of KIPs, including pepper balls, for crowd control at protests without warning and DPD officers shooting KIPs, including pepper balls, at protesters head, neck, and chest. This ratification gave DPD officers notice that these actions were consistent with Denver custom, policy, and practice.

184. The violations of Mr. Hampton's constitutional rights are a direct result of and caused by Denver's (and Chief Pazen's) policy, practice, and custom of authorizing DPD officers to use KIPs, including pepper balls, aimed at protesters head, neck, and face, without warning, to control and suppress protests.

### STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom of Speech and Assembly
### (Plaintiff against Defendants)

185. Plaintiff hereby incorporates all other paragraphs of this First Amended Complaint as if fully set forth herein.

186. Defendants, acted under color of state law, and within the course and scope of their employment, in their capacities as officers of the DPD at all times relevant to the allegations in this First Amended Complaint.

187. Defendants are "persons" under 42 U.S.C. § 1983.

188. Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

189. The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

190.    Plaintiff's expression was on a matter of public concern and did not violate any law.

191.    Plaintiff's expression occurred at a traditional public forum.

192.    Plaintiff assembled with others at a traditional public forum to express shared concerns about police brutality.

193.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression and assembly.

194.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

195.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

196.    At the time when Defendants stopped Plaintiff from speaking and gathering, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express himself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

197.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

198.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

199.    Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

200.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

201.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

202.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

203.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

204.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

205.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Violation — Retaliation**
**(Plaintiff against Defendants)**

206.    Plaintiff hereby incorporates all other paragraphs of this First Amended Complaint as if fully set forth herein.

207.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this First Amended Complaint.

208.    Defendants are "persons" under 42 U.S.C. § 1983.

209.     Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

210.     The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

211.     Plaintiff's expression was on a matter of public concern and did not violate any law.

212.     Plaintiff's expression occurred at a traditional public forum.

213.     Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation, including but not limited to use of physical force, including KIPs and chemical agents.

214.     By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence him, and to deter him from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

215.     Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

216.     At the time when Defendants retaliated against Plaintiff for exercising his First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

217.     Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

218.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

219.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

220.    Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

221.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

222.    The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

223.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

224.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

225.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

226.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**

**Fourth Amendment Violation — Excessive Force**
**(Plaintiff against Defendants)**

227.    Plaintiff hereby incorporates all other paragraphs of this First Amended Complaint as if fully set forth herein.

228.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this First Amended Complaint.

229.    Defendants are "persons" under 42 U.S.C. § 1983.

230.    Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

231.    Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

232.    Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents and KIPs.

233.    Defendants had no warrant authorizing any seizure of Plaintiff.

234.    Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights and is thereby liable for such failure to intervene.

235.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

236.    Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

237.    Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

238.    Defendants recklessly created the situation in which they used force.

239.    Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

240.    At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

241.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

242.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

243.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

244.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

245.    Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

246.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

247.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to

non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff

suffered during and after the protest, and other compensatory and special damages.

248.     Defendants' intentional actions or inactions as described herein intentionally

deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by

the Constitution of the United States of America.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Excessive Force
### (Plaintiff against Defendants)

249.     Plaintiff hereby incorporates all other paragraphs of this First Amended

Complaint as if fully set forth herein.

250.     Defendants acted under color of state law, and within the course and scope of

their employment, in their capacities as law enforcement officers for the DPD at all times

relevant to the allegations in this First Amended Complaint.

251.     Defendants are "persons" under 42 U.S.C. § 1983.

252.     Plaintiff had a protected Fourteenth Amendment Substantive Due Process interest

against being unreasonably harmed by the use of excessive force at the hands of law enforcement

personnel.

253.     Defendants did not have, at any time, a legally valid basis to use force against

Plaintiff.

254.     Defendants' use of force was extremely disproportionate.

255.     Defendants acted with malice and/or excessive zeal amounting to an abuse of

power.

256.     Defendants acted for the purpose of causing harm unrelated and unnecessary to

any relevant policing objective.

257.     Defendants' actions were arbitrary and/or conscience shocking in light of the circumstances confronting them.

258.     Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

259.     Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

260.     At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be secure from excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

261.     The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

262.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

263.     Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

264.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

265.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff

suffered during and after the protest, and other compensatory and special damages.

266.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Due Process
### (Plaintiff against Defendants)

267.     Plaintiff hereby incorporates all other paragraphs of this First Amended Complaint as if fully set forth herein.

268.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this First Amended Complaint.

269.     Defendants are "persons" under 42 U.S.C. § 1983.

270.     The orders issued by Defendants, and the authority on which those orders were based, were vague and not clearly defined.

271.     The orders issued by Defendants, and the authority on which those orders were based, offered no clear and measurable standard by which Plaintiff and others could act lawfully.

272.     Defendants lacked legal authority, through Denver municipal ordinance, state law, or otherwise, to order the dispersal of Plaintiff and, thereby, there were no explicit standards to govern the order of dispersal or limits on law enforcement's authority to order dispersal.

273.     Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

274.     The orders issued by Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand

what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory enforcement, or both.

275.     At the time when Defendants violated Plaintiff's due process rights, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be afforded due process of law. Any reasonable law enforcement officer knew or should have known of this clearly established right.

276.     Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

277.     The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver, including Chief Pazen.

278.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

279.     Defendant Denver and Chief Pazen failed to properly supervise and/or train its officers.

280.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

281.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

282.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.     All appropriate relief at law and equity;

B.     Injunctive relief, including:

    a.  Enjoining Defendants from using chemical agents, including pepper spray, against those exercising their rights of free speech and assembly;

    b.  Enjoining Defendants from shooting projectiles indiscriminately into crowds of those exercising their rights of free speech and assembly;

    c.  Enjoining Defendants from shooting projectiles at protesters unless there is an immediate threat of bodily injury to the protester, or others;

    d.  Requiring all Defendant law enforcement officers deployed to police demonstrations must have their body-worn cameras recording at all times, and forbidding officers from intentionally obstructing the camera or recording;

    e.  Requiring that all Defendant law enforcement officers deployed to police demonstrations must create a use of force report documenting every single deployment of KIPs, tear gas, or any other less-than-lethal weapon;

    f.  Requiring that any and all orders to disperse must only be given when there is imminent danger of harm to persons (not property);

    g.  Requiring that any and all orders to disperse must be followed by adequate time for the intended audience to comply, and officers must leave room for safe egress; if it appears the intended audience did not hear the order, the order must be repeated multiple times before the crowd is dispersed.

C.     Declaratory relief and other appropriate equitable relief;

D.     Economic losses on all claims as allowed by law;

E.      Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

G.      Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

H.      Pre-and post-judgment interest at the lawful rate; and

I.      Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 1st day of July 2022.

KILLMER, LANE & NEWMAN, LLP

_/s/ Andy McNulty_____
Andy McNulty
Darold W. Killmer
Reid Allison
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
amcnulty@kln-law.com
dkillmer@kln-law.com
rallison@kln-law.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Ashley Kelliher

Geoffrey Klingsporn
Denver City Attorney's Office
Litigation Section
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202
Telephone: (720) 913-3100
Facsimile: (720) 913-3155
Ashley.kelliher@denvergov.org
Geoffrey.klingsporn@denvergov.org

*Attorney for Defendants*

           KILLMER, LANE & NEWMAN, LLP

           *s/ Jesse Askeland*
           _____
           Jesse Askeland